No. 2--04--0629                                   filed: 3/8/06

_____

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

_____

| | | |
|---|---|---|
| JAMES K. WOLFE, | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| Plaintiff-Appellee and Cross-Appellant, | ) | |
| | ) | |
| v. | ) | No. 01--L--116 |
| | ) | |
| MENARD, INC., | ) | |
| | ) | Honorable |
| Defendant-Appellant and | ) | Ronald L. Pirrello, |
| Cross-Appellee. | ) | Judge, Presiding. |

_____

_____

JUSTICE KAPALA delivered the opinion of the court:

Defendant, Menard, Inc. (Menards), appeals from the judgment of the circuit court of

Winnebago County in favor of plaintiff, James K. Wolfe, after a trial by jury. Menards also

appeals from the order of the trial court denying its posttrial motion. Plaintiff cross-appeals

from certain rulings the trial court made during the hearing on the posttrial motion. We

reverse and remand this cause for a new trial, based upon the trial court's ex-parte

communication with the jurors during their deliberations, and we dismiss plaintiff's cross-

appeal.

FACTS

On November 11, 1999, plaintiff entered the warehouse area of the Menards store in Machesney Park, Illinois, to buy a 10-foot aluminum stepladder.  He did not seek assistance other than to ask an employee where he could find the ladders.  There were three 10-foot ladders that were stacked together, upside down, with the tops resting on the concrete floor.  On direct examination, plaintiff testified:

"Q. [By Mr. Perrecone] *** With respect to the 10-foot ladder stack that you went up to, you said there was [sic] three ladders there?

A.  Yes.

Q.  When you walked up to it, tell the jury what you noticed about the stack of ladders.

A.  Well, I noticed they were upside down and the first 10-footer was tilted in.

Q.  Towards the wall?

A.  Correct.

Q.  And what was behind the first 10-footer tilted towards the wall?

A.  There was [sic] two more ladders behind it, 10-footers.

Q.  Do you recall how those two 10-foot ladders were situated other than being upside down behind the one that you purchased?

A.  No, I don't."

On cross-examination, plaintiff gave the following testimony about the positioning of the ladders:

"Q. [By Mr. Young] None of the ladders against the wall that you were to select were affixed to each other; is that right?

A.  I don't know.  I can't answer that."

Plaintiff thought the ladders appeared to be stable. He grasped the first ladder, lifted it, and turned to place it on his cart. As he turned, he was struck on the head and back by one of the other ladders in the display. Plaintiff testified that this "threw [him] into a twisting, falling motion." He heard a pop in his left leg, whereupon he fell down and hit the floor. He experienced pain in his left leg. He called out for help, and Menards employees came to his aid.

At the time of this incident, plaintiff had a prosthesis in his left knee. As a result of a motorcycle accident years before, he had undergone two total left-knee replacements. After his fall at Menards on November 11, 1999, plaintiff was treated in the emergency room at Rockford Memorial Hospital. An X ray revealed a fracture of his left medial/tibial plateau. The medial/tibial plateau is where the femur and the tibia articulate at the knee joint. The X ray also showed that the prosthesis was loosened and was sinking into a large cystic lesion beneath it. The loosening had begun before the accident at Menards. Plaintiff underwent a third total left-knee replacement in December 1999. Following this surgery, he developed a chronic long-term infection of the prosthesis and osteomyelitis, which is an infection of the bone. Doctors testified that both conditions are serious and permanent and that plaintiff will be on antibiotics for the rest of his life. He has periodic flare-ups when the infection causes blood and pus to drain from his knee. Following the third total knee replacement, plaintiff had a series of procedures designed to clean the infection out of his knee.

On March 27, 2001, plaintiff filed suit against Menards. During trial, plaintiff filed an amended complaint in which he alleged that Menards was negligent in that it: (1) failed to stack the ladders in a safe manner, (2) stacked the ladders with no restraints to prevent

them from falling forward, (3) failed to warn customers about the hazards of falling merchandise, (4) knew or should have known that unrestrained stacked ladders presented a hazard of falling on customers, and (5) knew or should have known that ladders for customer sale should be restrained.

At trial, plaintiff presented a safety expert, William L. Jacobs. Mr. Jacobs testified that stacking the ladders upside down caused them to become unstable. He further testified that, at the time of plaintiff's accident, the standard in the industry for warehouse stores such as Menards was to restrain ladders in a display to prevent them from falling on customers. He cited to internal publications of Lowe's, Sam's Club (Wal-Mart), and Home Depot. Those stores had written, internal policies that required ladders to be restrained. In addition, Mr. Jacobs testified that the standard was written in an article in a professional safety journal.

Over Menards' relevance objection, Mr. Jacobs testified that at the time of plaintiff's accident, Menards did not have an officer who was responsible for safety, did not have a process for training employees in customer safety, and did not have written policies or procedures relating to customer safety. Mr. Jacobs opined that not having any written policies or procedures violated the standard of care in the industry. Mr. Jacobs further testified that Menards stores had collectively experienced 371 accidents from falling merchandise from May 1, 1997, to November 11, 1999. Six of these occurrences, including plaintiff's accident, involved falling ladders. Mr. Jacobs testified that, in addition to the ladder accidents, there had been "repeated" accidents involving falling carpeting, boards, paneling, and sledgehammers. Mr. Jacobs stated that the importance of these prior incidents was that Menards knew of the hazards of falling merchandise and took no

-4-

steps to minimize or eliminate the danger. Menards objected to the testimony related to falling merchandise and the lack of safety policies or procedures on the bases that the evidence bore on postaccident investigation and insurance coverage issues.

At the close of plaintiff's case, Menards' motion for a directed verdict was denied.

Menards presented evidence that assistance is available to customers in selecting and purchasing items. Testimony revealed that a Menards employee assigned to the hardware department in the warehouse portion of the Machesney Park store stacked the ladders as previously described, although the identity of that employee never became known. The store manager at the time of plaintiff's accident testified that he had no knowledge of any falling ladders in the Machesney Park store prior to plaintiff's accident. To counter the opinions offered by Mr. Jacobs, Menards presented the testimony of Gregory Wisniewski, a registered architect, who was allowed to testify over plaintiff's objection that he lacked expertise in the area of safely storing and displaying merchandise. Mr. Wisniewski was not aware of any written standard in the retail industry in 1999 for the display of ladders. He testified that the standard at the time of plaintiff's accident was to store ladders vertically in a neat fashion where they are laterally stable. His opinion was that Menards complied with the standard, because the ladders were leaning against the wall, and the force of the ladders would be pushing against the wall unless someone or something changed the force, causing the ladders to topple forward. On cross-examination, plaintiff's counsel elicited the opinion from Mr. Wisniewski that the standard in the retail industry from the mid-1970s to the present time was not to restrain ladders.

In response to Mr. Wisniewski's opinion that it was the standard at the present time not to restrain ladders, plaintiff offered the rebuttal testimony of Donald C. Roberts, a

private investigator.    The evening before Mr. Roberts's trial testimony, he was commissioned by plaintiff's attorney to visit Lowe's, Home Depot, and Sam's Club in Rockford, Illinois, to observe the ladder displays in those stores and to photograph them.  It was undisputed that plaintiff had not disclosed Mr. Roberts as a witness.  Over Menards' objection that plaintiff had not disclosed him as a witness, the trial court allowed Mr. Roberts to testify to his observations and admitted the photographs he took the evening before.  Mr. Roberts testified that the ladders at Home Depot and Lowe's were stored in racks with retaining bars to keep them from falling.  Sam's Club stored the ladders in a rack that was secured by a chain.

The jury ultimately returned a verdict in plaintiff's favor in the amount of $1.5 million, reduced by 50% to $750,000 to account for plaintiff's 50% fault.

The jury had two questions during its deliberations.  The first was a written note that requested copies of all the depositions and a copy of the incident report that Menards generated after plaintiff's fall.  Upon receiving this note, the trial judge called Menards' attorney, Mr. Young.  The court reporter was present in the judge's chambers and reported both sides of the telephone conversation, which was conducted over the judge's speaker phone.  The judge did not include plaintiff's attorney because he did not have the physical capability of making a conference call from the courthouse.  Mr. Young objected to the depositions and the incident report going to the jury.  The judge said he would call plaintiff's attorney, and then would call Mr. Young back and tell him what action the judge would take.  The judge next, in the presence of the court reporter, spoke with one of plaintiff's attorneys, Mr. Ferolie.  The judge explained the question and said he was disinclined to give the jury the depositions.  Mr. Ferolie requested that the depositions and the incident report be given

to the jurors. The judge said, "Well, I'm not going to give them the depositions." Mr. Ferolie responded, "Well, that's right, of course not." The judge then called Mr. Young and told him he was giving the jury a copy of the incident report. Mr. Young said, "Okay." The judge said, "All right. Talk to you later."

The second question was oral, and the trial judge answered it orally when he went into the jury room. The trial court did not place the substance of the communication on the record at the time it occurred or shortly after it occurred. No contemporaneous record of the judge's communication with the jury was made, and no stenographic record was made of any communications between the judge and counsel, as was done when the jury had requested the depositions and the incident report. The court reporter was available, however, because she later gave her affidavit of what transpired when the judge entered the jury room.

The subject of this second jury question first made it into the record on October 9, 2003, approximately two weeks after the verdict. After addressing an unrelated motion, Menards' co-counsel, Ms. Barton, stated:

> "If I could address one more issue, we know that the jury had a question during deliberations, and if I can look at the file and address this after I--[.]"

The case was passed for Ms. Barton to look at the file in the clerk's office. After she did that and returned to the courtroom, she stated:

> "I just went down to look through the court file. And what I am looking for is during deliberations the jury had a question about one of the verdict forms, and I don't see there is any written question and answer on file. Maybe I'm missing something."

The judge stated that the jurors wanted copies of the depositions. Ms. Barton responded:

"Actually, that was the first question. And then later in the deliberations there was another question about one of the verdict forms. We received a phone call. It was right before they came back with a verdict. We just received a phone call from you, your Honor, stating that they had a question about a verdict form. And I don't see any record of it and I just wanted to know what exactly occurred so I can file a bystander's report or make it part of the record."

At this time, the court's bailiff, Fred Jones, interjected:

"They were trying to say how to do the percentage."

The trial judge recalled, "It [the question] was to the bailiff, and the bailiff relayed the question orally to me; and it was how do we use the-- how do we figure the percentages for the verdict form is how it was conveyed to me." At this hearing, Menards' counsel learned from the trial judge that he had entered the jury room during deliberations.

Accounts of the events connected to the trial judge's communication with the jury are contained in the affidavits filed with Menards' February 4, 2004, posttrial motion, the affidavits filed by plaintiff in opposition to the posttrial motion, and the transcripts of October 9, 2003, and May 27, 2004. According to Mr. Young's affidavit, the jury began its deliberations at approximately 3:30 p.m. on September 23, 2003. At approximately 4:30 p.m., the judge called him about the jury's request for the depositions and the incident report. At approximately 9:40 p.m., the judge called a second time and informed him that the jury had a question about a verdict form and that the judge thought the jury would have a verdict soon. The jury returned its verdict at approximately 10 p.m. Ms. Barton's affidavit contained the same recollections as Mr. Young's. According to the court reporter's

affidavit, the jury started deliberations at approximately 3:30 p.m. and reached its verdict at approximately 10 p.m. At approximately 8 p.m., she overheard the judge "instruct" the jury that it "cannot assess anymore than 50 % negligence against the [p]laintiff or he would get nothing." Mr. Ferolie testified in his affidavit that the judge called him "and either told me [that he] had already answered the question or asked if I had an objection to him answering the question." In his affidavit, Mr. Perrecone, plaintiff's lead counsel, put the time of Mr. Ferolie's conversation with the judge at between 8 p.m. and 8:45 p.m.

The jury foreman, Shaun Webb, furnished two affidavits. In his first affidavit, he stated that the jurors notified the bailiff that they had a question about how to complete the verdict form. The bailiff said he would notify the judge of the question, whereupon the judge entered the jury room. Mr. Webb told the judge that the jury understood the verdict form to mean that "if we assessed more than 50 % negligence against the [p]laintiff he would not receive any compensation." According to Mr. Webb, the judge stated, "[E]xactly, you got it. You have to stop at 50 %. Unfortunately, that's what we have to live with." The judge then left the room, and the jury completed the verdict form. Mr. Webb elaborated on the incident in his supplemental affidavit, stating that when the judge entered the room, the jury had agreed to find plaintiff 70% to 75% at fault. He went on to say, "The judge's instruction influenced us to enter a verdict in favor of the [p]laintiff reduced by the stated 50 % for the [p]laintiff's contributory negligence." According to the supplemental affidavit, the jury reached its verdict within 25 minutes after the judge's statement.

Two other jurors filed affidavits. Juror Wassner testified that the judge came into the jury room at the jury's request. Mr. Webb asked the judge to confirm the jury's understanding of verdict form B, that if the jury found plaintiff to be more than 50% at fault,

plaintiff would get nothing. According to Ms. Wassner's affidavit, "Judge Pirrello confirmed the jury's understanding of Jury Verdict Form B and left the jury room." Ms. Wassner averred that the judge's statement did not influence her. Ms. Menke likewise testified that the judge "confirmed the jury's understanding about how to fill out" the verdict form. "[I]f we were to find plaintiff more than 50 % at fault, we could not use Jury Verdict Form B." Ms. Menke added, "I did not perceive [the judge's] statements about filling out Jury Verdict Form B to be a jury instruction." Ms. Menke further stated that she was not influenced by the judge's statements.

At the hearing on the posttrial motion, the trial court said:

"I have a clear recollection that I did not say the words attributed to be my words by Mr. Webb in that affidavit. I know I responded to the question. *** They had selected the verdict form that they were going to use. I'm unaware whether they--I did not see it. They referred to it. They spoke of it. I don't know if they signed it or filled it out. I know they wanted to know if they had chosen the right one for what they wanted to do."

The trial court struck Mr. Webb's supplemental affidavit and struck those paragraphs of Ms. Wassner's and Ms. Menke's affidavits that stated they were not influenced. The trial court denied the posttrial motion, and this timely appeal followed.

## DISCUSSION

### I. Plaintiff's Motion to Strike Parts of Menards' Reply Brief

Plaintiff filed a motion to strike parts of Menards' reply brief on the ground that the reply brief contains argument that was not included in the opening brief, and we ordered the motion taken with the case. We address it now. In its reply brief, Menards requests a new

trial on damages only, in the alternative to its request for a new trial on all issues. Plaintiff moves to strike this request, as Menards makes it for the first time in its reply brief. We are remanding this cause for a new trial on liability and damages for the reasons set forth below. Accordingly, the motion to strike is moot. Next, plaintiff moves to strike the first paragraph of argument in section X of the reply brief. Section X of the reply brief is captioned, "The court erred in not limiting the testimony of William Jacobs," and it corresponds with issue number X of the opening brief. Plaintiff complains that the first paragraph of section X of the reply brief misstates the record and for the first time on appeal alleges error with respect to a journal article that was introduced at trial. However, in the third segment of this opinion, we determine that issue number X raised in Menards' opening brief is waived for failure to argue the issue. Consequently, plaintiff's motion to strike the first paragraph of section X of the reply brief is moot. Plaintiff's third request is that we strike reference to Menards' supplemental disclosures in section VIII of the reply brief as being a misstatement of the record. Section VIII of the reply brief correlates to issue number VIII of the original brief, entitled, "The court erred in limiting Defendant's discovery when the trial date was continued." In the third segment of this opinion, we hold that Menards waived issue number VIII for failure to argue it. Thus, plaintiff's motion to strike is moot. Plaintiff lastly asks us to strike the discussion of Phillips v. Gannotti, 327 Ill. App. 3d 512 (2002), contained in section IX of the reply brief on the basis that the rule in Phillips was not urged in support of Menards' argument on issue number IX in its opening brief. Issue number IX of the opening brief and section IX of the reply brief raise issues with respect to the trial court's orders barring Menards' expert, denying Menards' motion to reopen discovery, and refusing to grant a continuance. Like issues VIII and X, we find

that issue IX is waived in the third segment of this opinion. Accordingly, plaintiff's motion to strike the discussion in section IX of the reply brief is moot.

## II. Dismissal of Plaintiff's Cross-Appeal

At the outset, we address whether we have jurisdiction to entertain plaintiff's cross-appeal. Plaintiff raises three issues in his cross-appeal: (1) whether the trial court erred in denying his motion to strike Juror Webb's original affidavit; (2) whether the trial court erred in denying plaintiff's motion to strike the court reporter's affidavit or parts thereof; and (3) whether the trial court erred in striking portions of the Menke and Wassner affidavits. Plaintiff's motions with respect to theses various affidavits were made during the hearing on Menards' posttrial motion.

We conclude that we do not have jurisdiction to hear the cross-appeal. Our supreme court held that "[a] party cannot complain of error which does not prejudicially affect it, and one who has obtained by judgment all that has been asked for in the trial court cannot appeal from the judgment." Material Service Corp. v. Department of Revenue, 98 Ill. 2d 382, 386 (1983). This court recently followed this rule in Rodriguez v. Sheriff's Merit Comm'n of Kane County, 355 Ill. App. 3d 676, 680 (2005). Here, plaintiff prevailed at trial and on Menards' posttrial motion. Consequently, he obtained by judgment all that he asked for in the trial court, and his cross-appeal will not lie. However, this rule governing cross-appeals does not mean that the issues raised by plaintiff are precluded from review. Hampton v. Cashmore, 265 Ill. App. 3d 23, 26 (1994). It is proper for us to consider those grounds in the context of Menards' appeal. Woodard v. Krans, 234 Ill. App. 3d 690, 699 (1992). Accordingly, we will examine the issues raised in the cross-appeal in the segment

of this opinion dealing with the trial court's communication with the jury during its deliberations.

## II. Menards' Appeal

### A. Waiver

Menards raises 12 issues. Plaintiff contends that eight of these issues are waived because of violations of Supreme Court Rule 341(e)(7) (Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(e)(7), eff. October 1, 2001). We agree. Rule 341(e)(7) provides, inter alia, that the appellant's brief shall contain:

> "Argument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on. *** Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." Official Reports Advance Sheet No. 21 (October 17, 2001), Rule 341(e)(7), eff. October 1, 2001.

On all eight of these issues, Menards violates the rule in various ways, such as failing to include references to the record or improperly referencing the record, leaving us to hunt for the matters cited; drawing conclusions instead of articulating its contentions and reasoning; and failing to cite case authorities. For instance, on issue number IX, Menards argues that the trial court erred when it barred Menards' expert witness from testifying that, due to plaintiff's preexisting condition, he would have required a third total knee replacement whether the accident at Menards had happened or not. In the four paragraphs Menards devotes to this issue, it incorrectly cites to the record (e.g.: "See letter/memorandum order dated June 26, 2003 from the Court, and the Transcripts from June 25 and June 26, 2003"), concludes with no supporting argument or reasoning that the trial court abused its

discretion, and fails to favor us with one case citation. On issue number XI, Menards asserts that the trial court erred in allowing testimony of plaintiff's recent pretrial medical treatment, claiming that the testimony was not timely disclosed. Menards' complete argument to support this issue is: "The [c]ourt erred in denying the motion to bar and the [d]efendant was prejudiced." Furthermore, Menards does not include references to pages in the record and does not cite any legal authority. These examples are illustrative of the other six issues. "It is well settled that this court is not 'a depository in which the appealing party may dump the burden of argument.' " Pilat v. Loizzo, 359 Ill. App. 3d 1062, 1063 (2005), quoting Pecora v. Szabo, 109 Ill. App. 3d 824, 826 (1982). The appellant must argue the points that he or she raises, or they are waived. Pilat, 359 Ill. App. 3d at 1063. A conclusory assertion, without supporting analysis, is not enough. Pilat, 359 Ill. App. 3d at 1063.

Accordingly, we move on to the issues that are not waived. These are: (1) whether the trial court erred in communicating with the jury during its deliberations; (2) whether the trial court should have directed a verdict in Menards' favor at the close of plaintiff's case-in-chief; (3) whether the trial court improperly allowed Mr. Roberts to testify in rebuttal; and (4) whether the trial court erred in giving the jury an itemized verdict form that included aggravation of a preexisting condition as a separate compensable element of damages.

### B. Jury Communication

### 1. Waiver

Menards contends that the trial court committed reversible error when it entered the jury room during deliberations and spoke to the jury about the verdict form. Plaintiff argues

that Menards waived this issue when it neither objected to the judge's conduct nor moved for a mistrial at trial. Plaintiff relies on a trio of cases that hold that failure to object to the trial court's response to a jury question waives that issue for appeal.

In People v. Patterson, 163 Ill. App. 3d 370 (1987), the jury sent two written questions to the judge. Patterson, 163 Ill. App. 3d at 372. Outside the presence of the defendant and his counsel, the judge instructed his deputies to advise the jurors to continue their deliberations and to make arrangements to contact their families. Patterson, 163 Ill. App. 3d at 372. Less than two hours after this occurred and before the jury reached its verdict, the trial judge in open court and on the record informed all of the parties of the questions and his response. Patterson, 163 Ill. App. 3d at 372. The defendant made no objection at this time to the judge's response. Patterson, 163 Ill. App. 3d at 372. The appellate court held that the defendant waived the issue for appeal because at trial the "[d]efendant was informed of the trial judge's responses to the jury's questions yet he failed to object to the substance of the answers or to the communication itself." Patterson, 163 Ill. App. 3d at 373. The trial court in People v. Humphrey, 89 Ill. App. 3d 673 (1980), answered the jury's two

written questions without consultation with the defendants, their counsel, or the prosecutor. Humphrey, 89 Ill. App. 3d at 676. However, before the jury was brought into the courtroom, the trial judge informed the defendants, their counsel, and the prosecutor of the answers he made to the jury's questions. Humphrey, 89 Ill. App. 3d at 676. The court informed the jury that a severed codefendant could not testify because the judge learned he intended to plead the fifth amendment, and the court answered "no" to the question whether transcripts

were available. Humphrey, 89 Ill. App. 3d at 676. The appellate court found waiver on two bases: first, the defendants' failure to object to the answers or to the procedure used in giving them "when they were informed of them at trial," and, second, their failure to complain of them in a posttrial motion. Humphrey, 89 Ill. App. 3d at 676. In Wodziak v. Kash, 278 Ill. App. 3d 901 (1996), the jury sent the judge three written questions. Wodziak, 278 Ill. App. 3d at 909. All attorneys were present and the trial court received their "commentary" before it answered the first question in writing. Wodziak, 278 Ill. App. 3d at 909. The answer given to this first question was what the appellate court termed a "standard answer" (Wodziak, 278 Ill. App. 3d at 914), that being, " 'The instructions given to you when considered altogether are sufficient.' " (Wodziak, 278 Ill. App. 3d at 909). The judge did not read the second and third questions to the attorneys, because those questions revealed the jury's preliminary verdicts on some of the counts. Wodziak, 278 Ill. App. 3d at 910. Instead, the judge summarized the questions for the attorneys, who made their suggestions and comments on the record. Wodziak, 278 Ill. App. 3d at 910. The judge answered the second and third questions in a note that read, " 'The instructions given to you, considered altogether, are sufficient to answer your questions.' " Wodziak, 278 Ill. App. 3d at 910. The appellate court held that, as the appellant's counsel expressed no dissatisfaction with the trial court's disposition of the matter, the issue was waived. Wodziak, 278 Ill. App. 3d at 914. However, waiver aside, the appellate court held that the appellant suffered no prejudice from the trial court's "standard answer." Wodziak, 278 Ill. App. 3d at 914.

We have scrupulously reviewed the record here. It does not lend itself to a full understanding of what happened below, but we take the record as it is. In regard to the

jury communication issue, it reveals that the jury retired to deliberate at approximately 3:30 p.m. The attorneys for both sides had left the courthouse by the time the two questions were given to the judge, but they were available by telephone in their respective offices. The jury informed bailiff Jones orally that it had a question on verdict form B. This is the verdict form that allowed the jury to find in plaintiff's favor but to reduce his overall compensation by the percentage of his fault. Mr. Jones orally informed the judge of the question. According to Mr. Jones, "They were trying to say how to do the percentage." We take this to mean that the jury was deliberating on the issue of plaintiff's comparative negligence. At 8 p.m., the court reporter saw the judge enter the jury room and overheard the judge discuss with the jury the issue of plaintiff's comparative negligence. Sometime between 8 p.m. and 8:45 p.m., the judge called plaintiff's attorney and informed him that the judge either had answered the jury's question or was going to answer it. At 9:40 p.m., the judge called Menards' attorney and informed him that the jury had a question about a verdict form and that he thought it would be back shortly with a verdict. Mr. Young replied that he was on his way to the courthouse. At approximately 10 p.m., the jury returned its verdict. The jury was not polled. At no time before the jury was called into the courtroom to render its verdict did the judge make a record of the jury's oral question and his response to it. It is unclear whether the judge consulted with plaintiff's attorney before he entered the jury room. It is clear, however, that he did not consult with Menards' attorney before he spoke to the jury. The judge himself admitted that he may not have apprised either party of his actions. He did not divulge to Menards' attorney in the 9:40 p.m. call that he had an ex-parte communication with the jury.

Ms. Barton was clearly taken by surprise almost two weeks later when she discovered that the judge had entered the jury room to respond to an oral question. When counsel suggested making a bystander's report, the judge said:

"Oh, sure. *** They had a question for the bailiff. And it was an oral question the bailiff had conveyed to the court, and I simply went to them and said they are to use the written instructions that they have been given and from that they should determine a verdict."

Ms. Barton then said, "You instructed them to--," whereupon the judge said, "I went in and told them in almost exactly those words, yeah." Ms. Barton asked, "Did they have a question about a particular verdict form?" The judge said, "I believe that they had a question about which one to use, how to-- let me see if I can remember exactly what they said." Ms. Barton asked, "But the question was to the bailiff?"

"THE COURT: It was to the bailiff, and the bailiff relayed the question orally to me; and it was how do we use the--how do we figure the percentages for the verdict form is how it was conveyed to me.

MS. BARTON: And then you don't recall if the bailiff was there, but you went into the jury room and just told them to continue--

THE COURT: My recollection is that the bailiff was not with me when I went into the jury room.

MR. JONES: I was not.

***

MS. BARTON: And that's all that was said was to continue--

THE COURT: Yes, ma'am."

This exchange leaves no doubt that this was the first time counsel for Menards learned that the trial judge had visited the jury room and answered a question. Counsel for Menards had no opportunity to object to the procedure at trial, because they were not told about the judge's communication with the jurors until after the jury was discharged, and then only because Ms. Barton persisted in asking questions. This is in contrast to the cases cited by plaintiff, where the parties or their attorneys were made aware of the communications before the jury was discharged. Menards did raise this issue in its posttrial motion, the first opportunity it had to do so. Accordingly, Menards has not waived this issue for review.

2. Use of Affidavits

Plaintiff asserts that the affidavits Menards furnished in support of its posttrial motion were improper because Menards knew before the jury was discharged that the judge had personal contact with the jury and did nothing about it. Plaintiff argues that obtaining affidavits weeks and months after the verdict and presenting them with the posttrial motion circumvented the approved procedure of questioning the jurors in open court about the judge's contact.

However, plaintiff is laboring under a mistaken premise. Plaintiff does not cite to a page in the record to substantiate his claim that Menards knew of the judge's communication with the jury before the jury was discharged. Our review of the record discloses that this allegation is not supported by the record. Nor do we believe that Menards could have discovered it by polling the jury, as plaintiff suggests. A jury poll would likely not have revealed the existence of the judge's ex-parte visit unless the defense had some reason to ask that particular question, and counsel for Menards did not have any reason to ask at that point. Plaintiff concedes that where the contact is not known until

after the jury is discharged, evidence by way of juror affidavit may be the only way to establish the fact of the contact.

Turning to the issue of the admissibility of the affidavits, there are two broad categories of situations in which affidavits of jurors are offered in an attempt to impeach a jury's verdict. People v. Holmes, 69 Ill. 2d 507, 511 (1978). "In the first category are those instances in which it is attempted to prove by a juror's testimony or affidavit the motive, method or process by which the jury reached its verdict." Holmes, 69 Ill. 2d at 511. These, almost without exception, are inadmissible. Holmes, 69 Ill. 2d at 511. "The second category involves those situations in which the testimony or affidavit of a juror is offered as proof of conditions or events brought to the attention of the jury without any attempt to show its effect on the jurors' deliberations or mental processes." Holmes, 69 Ill. 2d at 512. Our supreme court has concluded that a juror should be permitted to testify as to whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Holmes, 69 Ill. 2d at 516. Our supreme court also has recently reaffirmed that jurors' affidavits are admissible when they are offered "as proof of the existence of improper extraneous influences on the jury." Redmond v. Socha, 216 Ill. 2d 622, 636 (2005).

With this distinction in mind, we examine juror Webb's affidavits. His original affidavit said the jury notified the bailiff of the question about how to complete the verdict form. This affidavit further stated that when the judge entered the jury room, Mr. Webb told the judge that the jury understood the verdict form to mean that a verdict that plaintiff was more than 50% negligent would result in no compensation. According to Mr. Webb's original affidavit, the judge replied, "[E]xactly, you got it. You have to stop at 50 %.

Unfortunately, that's what we have to live with," whereupon the judge left the jury room, and the jury continued to deliberate. This affidavit complies with Holmes and Redmond except for the statement of what the jury understood the verdict form to mean. Therefore, this statement should be stricken and ignored. The remainder of the affidavit may be considered for the purpose of showing the existence of an improper extraneous influence on the jury.

Mr. Webb's supplemental affidavit contained the statements that the jury agreed to find plaintiff 70% to 75% at fault before the judge entered the jury room and that the judge's instruction influenced the jury to enter a verdict in plaintiff's favor, finding him only 50% at fault. This affidavit goes into the jurors' deliberations and mental processes and is inadmissible, as the trial court properly determined when it struck the affidavit. Because we find that the supplemental affidavit was properly stricken, we do not reach plaintiff's argument that the portions of the Wassner and Menke affidavits that were stricken should be reinstated. Plaintiff advanced that argument only in the event we considered Mr. Webb's supplemental affidavit.

Menards also submitted the court reporter's affidavit. She testified that the jury went out to deliberate at approximately 3:30 p.m. and did not reach a verdict until approximately 10 p.m. She further stated that she stayed in the courtroom while the jury was deliberating, in case she was needed to make a written record. At approximately 8 p.m., she overheard the judge tell the jury that it "cannot assess anymore than 50 % negligence against plaintiff or he would get nothing," at which time the judge left the jury room, alone. The court reporter stated that before the judge entered the jury room, she overheard the jurors agree that plaintiff was 70% to 75% negligent. Plaintiff argues that the court reporter's affidavit

should have been stricken, as it reveals the method or process of the jury's deliberations. The first question we must answer is whether the court reporter's affidavit is subject to the same rules as a juror's affidavit. We conclude that it is. In Redmond, the trial court was not presented with jurors' affidavits but with opposing affidavits from the attorneys, describing statements made to them by individual jurors. Redmond, 216 Ill. 2d at 637. The court said, "We see no reason to treat an attorney's affidavit purporting to reveal jurors' opinions on motive, method, or process any differently than juror affidavits." Redmond, 216 Ill. 2d at 637. However, the court reporter's entire affidavit is not subject to being stricken. Only the statement that she overheard the jury agree that plaintiff was 70% to 75% negligent reveals the mental processes of the jury. The remainder of the affidavit showed the existence of an improper extraneous influence and was properly admitted.

### 3. Prejudice

We turn now to the substance of Menards' argument that it is entitled to a new trial. We begin our analysis with Holmes. We reiterate that Mr. Webb's original affidavit and the court reporter's affidavit are properly considered on the allegation that the trial judge's conduct amounted to a prejudicial outside influence on the jury. This is the first step in the Holmes analysis. Holmes, 69 Ill. 2d at 516. We next consider whether, under the circumstances shown, the judgment must be reversed and the cause remanded for a new trial. See Holmes, 69 Ill. 2d at 516. We will reverse and remand if Menards has shown that the proceeding raised " 'such a probability that prejudice will result that it is [to be] deemed inherently lacking in due process.' " Holmes, 69 Ill. 2d at 516, quoting United States ex rel. Tobe v. Bensinger, 492 F.2d 232, 237 (7th Cir. 1974).

Holmes was an attempted armed robbery prosecution.  Holmes, 69 Ill. 2d at 509.
After the attempted robbery, the complainant pointed out to police her assailant's shoe
prints in the snow.  Holmes, 69 Ill. 2d at 509.  As a result, the police caused the defendant
to make shoe prints in the snow.  Holmes, 69 Ill. 2d at 509-10.  At trial, one of the arresting
officers testified that the print left by the heel of the defendant's left shoe matched the print
left by the assailant, that a crack extended from the brand name logo toward the corner of
the heel, and that the insignia "Florsheim" was in the heel of each print.  Holmes, 69 Ill. 2d
at 510.  Several members of the jury went to a Florsheim shoe store and inspected various
heels of shoes for the purpose of ascertaining their trade design.  Holmes, 69 Ill. 2d at 510.
 The jurors observed a design with a crack or a line, and the results of the investigation
were discussed during deliberations.  Holmes, 69 Ill. 2d at 510.

In holding that the defendant in Holmes had made the required showing of a
probability that prejudice would result, our supreme court stated:

"Here the extraneous information improperly brought to the jury's attention was in

the nature of evidence crucial to the question of defendant's identification with which

he had neither been confronted at trial nor had the opportunity to refute.  Under

these circumstances we hold that the investigation by the members of the jury

resulted in error so prejudicial that the judgment must be reversed and the cause

remanded."  Holmes, 69 Ill. 2d at 519.

Holmes was applied to a civil case in Heaver v. Ward, 68 Ill. App. 3d 236 (1979).
"Cases in the civil context subsequent to Holmes have interpreted Holmes as 'accept[ing] a
standard that there must be a probability of prejudice.' "  Waller v. Bagga, 219 Ill. App. 3d
542, 547 (1991), quoting Frede v. Downs, 101 Ill. App. 3d 812, 814 (1981).  This court

likewise applied Holmes to a civil case in Haight v. Aldridge Electric Co., 215 Ill. App. 3d 353 (1991). Probability of prejudice is the standard because Holmes forbids using evidence to prove the actual effect of the conduct on the mind of the jury. Holmes, 69 Ill. 2d at 514.

In People v. Hobley, 182 Ill. 2d 404 (1998), our supreme court held that the Holmes standard of probability of prejudice was met where jurors' affidavits established that patrons in a restaurant intimidated them by shouting comments such as, " 'you know he's guilty' " and " 'give him the death penalty.' " Hobley, 182 Ill. 2d at 459. Recently, our supreme court explained the meaning of Hobley:

"The lesson of Hobley is that a juror affidavit alleging exposure to 'prejudicial outside influences' [citation] is sufficient to raise a presumption of prejudice and to shift the burden to the State to establish that such contacts were harmless." (Emphasis in original.) People v. Williams, 209 Ill. 2d 227, 241 (2004).

We learn from Holmes, Hobley, and Williams that the aggrieved party must first raise the probability of prejudice. This is met where the unauthorized conduct directly relates to a crucial issue in the case. Haight, 215 Ill. App. 3d at 369. Once a party establishes that exposure to an outside influence has resulted in the probability of prejudice, two things happen at the same time: the presumption of prejudice arises, and the burden shifts to the opposing party to establish that the outside influence was harmless.

Using this framework, we examine what happened in our case. Juror Webb's affidavit and the court reporter's affidavit alleged that the judge entered the jury room. Their affidavits aver that the judge made a statement to the jurors regarding plaintiff's percentage of fault. This communication was made while the jury was deliberating (when the jury was

"trying to say how to do the percentage") and without consultation with all counsel. Comparative negligence was a crucial issue in the case because if the jury had assessed more than 50% comparative negligence to plaintiff, he would recover nothing, and the verdict would be against plaintiff and in favor of Menards. Thus, we have the situation of an outside communication with the jury about a crucial matter pending before it. Consequently, Menards has shown the probability of prejudice, and the trial judge's communication was presumptively prejudicial. The burden then shifted to plaintiff to establish that the communication was harmless.

Plaintiff introduced Ms. Wassner's and Ms. Menke's counteraffidavits with statements to the effect that the judge did no more than explain that if the jury assessed more than 50% comparative negligence, plaintiff would receive no compensation. This, plaintiff correctly asserts, is an accurate statement of the law. At the hearing on the posttrial motion, the trial judge did not state with particularity what he told the jurors, but he did say that he did not use the words the Webb affidavit attributed to him and that his recollection comported rather closely with Ms. Wassner's and Ms. Menke's. We know from this that the judge said more than the "standard answer" found to be innocuous in <u>Wodziak</u>.

We do not have to believe one version of facts over another. The trial court did not remember whether it consulted either side before entering the jury room, and it acknowledged that it may not have. Mr. Ferolie's affidavit stated that the judge called either before or after his communication with the jury, leaving open the possibility that plaintiff's lawyers were not consulted beforehand. The judge did not obtain Menards' attorneys' permission to speak with the jury. Under these circumstances, where the trial judge had an

unauthorized ex-parte communication with the jurors during their deliberations about a crucial issue in the case, even if only to make an accurate statement of the law, Menards has raised the probability of prejudice.

Indeed, the judge himself was concerned that he may have improperly influenced the jury. The judge said:

"My initial reaction to this issue *** was to set it [the verdict] aside, to retry the case because [of] my own mortification at possibly having influenced [the jury]."

The judge characterized his conduct as "improper," and he acknowledged that the Webb affidavit had the "flavor" that his conduct influenced Mr. Webb.

In determining whether the communication was harmless, we have to consider the allegations made by Mr. Webb and the court reporter. Mr. Webb testified that when the judge entered the jury room, he said, "[E]xactly. You got it. You have to stop at 50 %. Unfortunately, that's what we have to live with." While this language could be construed as a clarification that, if the jury wished to award plaintiff damages, it could not exceed 50%, it also could be construed as a suggestion if not an outright direction from the court as to what the jury's verdict should be. Similarly, the court reporter's recollection that the judge stated that the jury "cannot assess anymore than 50 % negligence against the plaintiff or he would get nothing" may be taken as a straightforward statement of the law, or it could be construed as a direction to the jury. Plaintiff recognizes this ambiguity in the record. Far from negating the possibility of prejudice, this ambiguity prevents plaintiff from being able to establish that the judge's communication was harmless.

We also consider that the outside influence in this case was the trial judge and not some other court functionary. In his prefatory remarks to the venire before beginning voir

dire, the judge stated, "The [c]ourt presides over the law and I will give you the law and you'll have to follow it to the best of your abilities as you deliberate over the facts that you will hear in this case." It was in his role as law giver that the judge visited the jury room during deliberations. The jury or individual jurors may have believed that they were not free to reject anything the judge told them. "Juries tend to view judges as the embodiment of the law." United States v. Hodges, 189 F. Supp. 2d 855, 861 (S.D. Ill. 2002).

Although United States v. Burns, 683 F.2d 1056 (7th Cir. 1982 ), was a criminal case in which the defendant's right to be present pursuant to Rule 43(a) of the Federal Rules of Criminal Procedure, was at issue, we find the case instructive on the issue of a trial judge's unauthorized ex-parte communication inside the jury room while the jury is deliberating. In Burns, after the jury had been instructed and had been deliberating for several hours, one juror had difficulty with the meaning of the term "overt acts" as used with reference to the conspiracy charge. Burns, 683 F.2d at 1057. The trial judge entered the jury room with a court reporter, without consulting with the defendant or his attorney. Burns, 683 F.2d at 1057. The judge and the puzzled juror engaged in a colloquy that the court reporter transcribed. Burns, 683 F.2d at 1058. In this colloquy, the judge voiced a supplementary instruction defining an "overt act." Burns, 683 F.2d at 1057. The reviewing court said that it was unnecessary to consider whether the judge's statements in the jury room constituted a sound definition of an "overt act," because of its concern that the discussion may have diverted the jury's attention from other essential elements of the conspiracy offense. Burns, 683 F.2d at 1059. In our case, the error was more serious than that in Burns because the judge did not have the court reporter present. The lack of a record impairs appellate review. The affidavits and counteraffidavits in this case do not provide us with the accuracy

or reliability of a transcript. Also, the lack of a court reporter lends itself to juror confusions. Up to this moment, the jury had seen the court reporter memorialize what was said in the courtroom. Suddenly, the judge appeared commenting on a crucial issue in its deliberations but without the formality of a court reporter. This left the jury to wonder as to the significance of the judge's comments.

Plaintiff attacks the credibility and the reliability of Mr. Webb's and the court reporter's affidavits. Plaintiff cautions us to be skeptical of the Webb affidavit because it was furnished several weeks after the jury was discharged and after Menards' counsel spoke with Webb. Plaintiff impugns the integrity of the court reporter's affidavit on the basis that the court reporter committed a crime when she eavesdropped on the jury's deliberations. We are not persuaded by these arguments. There is no indication that any delay in securing Mr. Webb's affidavit resulted in inaccuracy or impropriety. Also, we know of no prohibition against speaking with a juror once the jury has been discharged. As we pointed out, Mr. Webb's recollection is not inherently incompatible with the judge's recollection of what occurred. Mr. Webb's affidavit allows for an inference that he was influenced, a possibility the judge conceded. There is no evidence that the court reporter clandestinely eavesdropped on the deliberations. She remained in the courtroom in case she was needed to make a record.

Plaintiff cites People ex rel. Walker v. Pate, 53 Ill. 2d 485 (1973), and Nelson v. Hydraulic Press Manufacturing Co., 84 Ill. App. 3d 41 (1980), for the proposition that it is Menards' burden to demonstrate that it was prejudiced by the judge's ex-parte communication with the jury. The Holmes, Hobley, Williams analysis that we undertook to resolve this issue is not in conflict with Walker and Nelson. The Holmes, Hobley, Williams

analysis applies where the communication has the probability of prejudice. The communications at issue in the cases cited by plaintiff were not of the type that would raise a probability of prejudice, that is, neither <u>Walker</u> nor <u>Nelson</u> involved communications with the jury about a crucial issue in the case. In <u>Walker</u>, the judge visited with prospective jurors, including those who ultimately comprised the jury, to inquire if any juror would volunteer to extend his or her service. <u>Walker</u>, 53 Ill. 2d at 504. The jury in <u>Nelson</u> asked for either a new verdict form or a new special interrogatory form because it wished to correct a mistaken mark. <u>Nelson</u>, 84 Ill. App. 3d at 49. The trial judge instructed the bailiff to inform the jury that it should scratch out its original misplaced mark and enter its intended answer on the appropriate form. <u>Nelson</u>, 84 Ill. App. 3d at 49. "There [was] no evidence in the record to indicate that either the trial judge or the bailiff suggested to or informed the jury how to answer the special interrogatory or what verdict to enter." <u>Nelson</u>, 84 Ill. App. 3d at 49.

Accordingly, we hold that Menards is entitled to a new trial.

The scenario described herein was unfortunate. Both sides put considerable time and resources into trying this case. The outcome to both sides was not insignificant. On one hand, plaintiff stood to recover $750,000 for a very serious, permanent injury. On the other hand, the verdict would have resulted in Menards' favor if plaintiff's fault had been assessed at greater than 50%. To guide trial courts, we urge upon them the following procedures.

All jury questions should be submitted to the court in writing.[1] If the jury sends out

---

[1]Section 2--1107 of the Code of Civil Procedure (735 ILCS 5/2--1107 (West 2002)) requires that the court shall give instructions to the jury only in writing. The salutary effect

an oral question, the court should advise it to reduce the question to writing. The written question or note should be transmitted from the jury to the court's bailiff. Upon receipt of the written question or note, the court should immediately notify all counsel. The court should place the substance of the note or question on the record, in counsel's presence, whether that be in person or by telephone. Or, if a party is pro se, the record should be made in the presence of the party. If the court, after diligent effort, is unable to secure counsel's or a party's presence, the judge should make a record of that fact. The court should make a record of its proposed answer to the jury's note or question, and give counsel or the parties the opportunity for discussion or objections. The court should answer the note or the question in writing, again transmitted by the bailiff to the jury. After the jury is discharged, the written communications should be made part of the common-law record. Rarely, if ever, should the trial judge personally enter the jury room while the jury is deliberating, even to answer administrative or housekeeping questions. Compliance with this protocol will minimize or avoid altogether what happened in this case.

We make one other comment. Although Menards did not request that a different judge hear its posttrial motion, we think it was incumbent on the trial judge, who became a witness, to disqualify himself. Supreme Court Rule 63(C)(1)(a) (188 Ill. 2d R. 63(C)(1)(a)) provides in relevant part:

> "(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

---

of this statute should carry over to all communications with the jury.

(a) the judge has a personal bias or prejudice concerning a party or a party's

lawyer, <u>or personal knowledge of disputed evidentiary facts concerning the proceeding</u>[.]" (Emphasis added.)  188 Ill. 2d R. 63(C)(1)(a).

Menards further contends that inconsistencies in the verdict demonstrate the jury's confusion. Because we reverse and remand for a new trial, we need not address this issue.  Also, we need not address Menards' argument that the trial court should not have stricken juror Webb's supplemental affidavit, as we have already determined that the trial court properly struck it.

### C.  Other Issues

Menards also contends that the court should have directed a verdict in its favor at the close of plaintiff's case, that the trial court erred when it allowed Mr. Roberts to testify in rebuttal, and that the trial court erred when it submitted to the jury an itemized verdict form with a separate line for compensation for aggravation of a preexisting condition.  Because we remand this cause for a new trial, we need not reach these issues.

### CONCLUSION

For the foregoing reasons, we reverse the judgment of the circuit court of Winnebago County and remand this cause for a new trial.

Reversed and remanded; cross-appeal dismissed.

GROMETER, P.J., and HUTCHINSON, J., concur.