GENEVIEVE WODZIAK, Indiv. and as Special Adm'r of the Estate of Joseph Wodziak, Deceased, Plaintiffs-Appellees and Cross-Appellants, v. ROBERT KASH, Defendant-Appellant and Cross-Appellee (John McMahan, Defendant and Cross-Appellee).

First District (5th Division)   No. 1—95—0676

Opinion filed March 22, 1996.—Rehearing denied April 19, 1996.

902

Thomas H. Fegan and Kelly N. Warnick, both of Johnson & Bell, Ltd., and Eric F. Quandt and Jayne Rizzo Reardon, both of Kelley, Drye & Warren, both of Chicago (Amy D. Mayber, of counsel), for appellants.

Donald T. Bertucci, of Chicago, for appellee.

JUSTICE COUSINS delivered the opinion of the court:
The plaintiff, Genevieve Wodziak, acting individually and as

special administrator of the estate of Joseph Wodziak, deceased, sued the defendants, Dr. Robert Kash and Dr. John McMahan, in counts of medical negligence and wrongful death. Following a jury trial, the jury found for plaintiff on the negligence count against Dr. Kash, awarding damages of $900,000. The jury found for the defendants on all other counts. Dr. Kash made a post-trial motion to reduce the award by $250,000, the amount plaintiff had obtained from a settlement with a hospital. Plaintiff contended that because the settlement had compensated for a different injury as well as the injury at issue, the trial court should hold a hearing to apportion the settlement by injury for contribution purposes. However, the court granted Dr. Kash's motion to reduce the award. Dr. Kash appeals the judgment against him, arguing that (1) he is entitled to judgment *n.o.v.* because plaintiff failed to establish a *prima facie* case of medical negligence; (2) he is entitled to a new trial because the jury's verdict was contrary to the manifest weight of the evidence; and (3) the trial court committed prejudicial error by refusing to disclose the contents of two jury inquiries to his counsel. Plaintiff has cross-appealed, arguing that (1) the court's decision to grant the $250,000 reduction was improper, and (2) the verdict in favor of Dr. McMahan was against the manifest weight of the evidence.

We affirm.

BACKGROUND

On October 2, 1986, decedent was admitted to MacNeal Hospital for severe lower back pain. Within a few hours, decedent suffered a massive myocardial infarction. Decedent remained in the hospital for 20 days, after which Dr. Kash determined that decedent could be released.

The incident at issue with Dr. Kash occurred on November 7, 1986, when decedent entered the emergency room at MacNeal Hospital complaining of shortness of breath. The attending physician examined decedent at 6 p.m. and diagnosed him as having acute respiratory stridor—a high-pitched noise indicating that the body's breathing passages are blocked. The attending physician administered drugs to decedent to dilate his airways. At 7 p.m., the attending physician called Dr. Kash, who ordered decedent to be admitted to the hospital for further observation. At 9:30 p.m., the attending physician again called Dr. Kash and recommended not admitting decedent because his condition had vastly improved, and Dr. Kash followed this recommendation, which resulted in decedent's discharge at 10:30 p.m.

On November 9, 1986, decedent became unconscious and was

taken to Holy Cross Hospital, and the hospital discovered that decedent had severe retention of carbon dioxide. An anesthetist attempted to intubate decedent down his trachea, but he discovered an obstruction of the trachea known as a subglottic stenosis—a narrowing of the airway at the level of the cricoid. A smaller endotracheal tube was introduced that would dilate the stenosis and permit decedent to be ventilated.

Decedent continued to have breathing difficulties, and he was transferred to Northwestern Memorial Hospital on November 25, 1986. On that date, Dr. McMahan examined decedent and discovered that decedent's stenosis had blocked off a substantial part of his airway. Thus, Dr. McMahan immediately performed an emergency tracheostomy to allow decedent to breathe.

The stenosis continued to progress so that decedent was soon unable to talk. On May 11, 1987, the incident at issue with Dr. McMahan occurred when Dr. McMahan attempted laser resection surgery to remove the stenosis. During the surgery, decedent suffered massive bleeding from his innominate artery, and additional surgery was required to repair the artery. This procedure resulted in a cerebral vascular accident, commonly known as a stroke. In addition, the reparation of the innominate artery reduced decedent's blood flow to the brain by half. Decedent was soon dependent on others for all care and mobility, and he died on November 18, 1993.

On September 30, 1988, decedent filed a complaint against Dr. Kash and MacNeal Memorial Hospital for medical negligence for injuries received on October 2, 1986, and thereafter. Dr. McMahan was later added as an additional defendant. On November 2, 1993, MacNeal settled with decedent for $250,000. On November 3, 1993, decedent filed his fourth amended complaint, on which a trial began on November 12, 1993. However, decedent died on November 18, 1993, and a mistrial was declared the next day.

On November 29, 1993, plaintiff filed her fifth amended complaint. Count I alleged that Dr. Kash had negligently failed to take adequate steps to ascertain the cause of decedent's stridor on November 7, 1986, and negligently failed to render proper treatment, resulting in severe injury, great pain, and medical expenses. Count II alleged that Dr. McMahan carelessly and negligently performed surgery on the decedent so that a fistula on the innominate artery was formed which required additional immediate surgery to remove, during which decedent suffered his cerebral infarct. Count III was an action for loss of consortium against Dr. McMahan. On December 29, 1993, plaintiff amended her complaint to add an additional count of wrongful death against both Dr. Kash and Dr. McMahan.

The second trial commenced on September 30, 1994. Dr. Carney testified for the plaintiff as a medical expert. Establishing his credentials, he testified that he was board certified in thoracic and cardiovascular surgery. He had repeated experience in the diagnosis of tracheal and subglottic stenosis and the treatment of tracheal stenosis, and was knowledgeable of the standard of care as to diagnosis of tracheal and subglottic stenosis. Dr. Carney had treated many cases of stenosis with dilatation and had treated several cases of subglottic stenosis in his residency.

Dr. Carney gave the following testimony on decedent's medical treatment:

"MR. BERTUCCI [plaintiff's counsel]: What was the diagnosis then made by the emergency room staff at Holy Cross Hospital on November 9, 1986.

DR. CARNEY: Subglottic stenosis.

Q. Again, can you tell the ladies and gentlemen of the jury briefly what is subglottic stenosis.

A. Yes. Subglottic stenosis is a narrowing of the airway at the level of the cricoid essentially which interferes with the adequate flow of air for the individual.

Q. Doctor, do you have an opinion within a reasonable degree of medical and surgical certainty as to whether this patient, Mr. Joseph Wodziak, had subglottic stenosis when he was in the emergency room of MacNeal Memorial hospital on November 7, 1986?

A. Yes, I do.

Q. What is that opinion?

A. The opinion that it existed at that time.

* * *

Q. Dr. Carney, I was asking you a question with regard to the standard of care regarding Dr. Robert Kash. Let me ask you this question. Do you—are you familiar with the standards of care and what they were with regard to an internist in the diagnosis of subglottic or tracheal stenosis in 1986?

A. I don't think the standard of care of an internist is any different than anyone else for this condition.

Q. Do the standards of care required of internists to diagnose and treat this condition cut across all branches of medicine in terms of standards of care?

A. Yes.

MR. CUNNINGHAM [appellant's counsel]: Objection to the leading nature of the question.

THE COURT: Overruled.

THE WITNESS: It is a critical problem that deserves attention by whoever sees the patient.

Q. Dr. Carney, let me ask you this question. Do you have an opinion within a reasonable degree of medical certainty as to whether Dr. Robert Kash deviated from the standard of care for a reasonably well-qualified internist when he was telephoned by the emergency room physician on November 7, 1986?

MR. CUNNINGHAM: Objection, your Honor, once again to the foundation, of the form of both Smith versus Monet and Wilson versus Clark as well.

THE COURT: Objection is overruled.

Q. You may answer, Doctor.

A. Yes.

Q. What is your opinion, Doctor?

A. The opinion is once the diagnosis of respiratory stridor is made, it should have been investigated either by referral to a competent ENT man or by ordering a CT scan to determine the pathology at that time.

* * *

Q. I'm asking, Dr. Carney, do you have an opinion within a reasonable degree of medical and surgical certainty whether there was any delay in the treatment of the patient's condition of subglottic stenosis caused by the conduct of Dr. Robert Kash?

A. Yes, there was.

MR. CUNNINGHAM: I have an objection based on foundation.

THE COURT: Overruled.

THE WITNESS: Yes, there was.

Q. And in your opinion, Dr. Carney, what was the delay caused in the treatment of this patient's condition of subglottic stenosis as a result of the conduct of Dr. Kash?

A. The delay in referral for definitive treatment.

Q. Now, in terms of the treatment of the condition of subglottic stenosis, is the period of time between diagnosis and treatment of the condition important?

A. Yes, it is.

MR. CUNNINGHAM: Objection, your Honor. Now we're getting into areas of foundation with regard to this witness' qualifications to testify in that area.

THE COURT: Overruled.

Q. I didn't hear the answer, Doctor.

A. Timing is critical.

Q. Why is timing critical in the treatment—the time for the diagnosis and treatment of this condition?

A. Because—

MR. CUNNINGHAM: Objection, once again on the basis of foundation, your Honor.

THE COURT: The witness has testified as to his experience. The objection is overruled.

MR. CUNNINGHAM: Your Honor, may I have a continuing objection?

THE COURT: Yes.

MR. CUNNINGHAM: Thank you.

Q. Do you remember the question, Doctor?

A. Yes, sir.

Q. Would you answer the question?

A. The reason the timing is critical is because if you can catch an area that's narrowing before it gets too tight, you can try to maintain patency by dilating it. And by dilatation, I mean passing instruments down of different graduated size to increase that opening and try to maintain it.

And if the narrowing gets so extreme that you can't do that, then the patient becomes an emergency. And the results are not as good. If you can prevent it from constricting down, then you can accomplish a great deal.

It's possible for a patient to develop an injury to the trachea and develop injury to the subglottic area, and for him to be dilated for as long as 14 years intermittently to maintain patency without any catastrophic impact.

MR. CUNNINGHAM: Your honor, I object based on Supreme Court Rule 220. I ask to be heard on this.

THE COURT: All right. Outside.

* * *

MR. BERTUCCI: I want to point out to the court when Mr. Cunningham took Dr. Carney's deposition on October 5, 1992, on pages 34, 35, 36, and 37 of the deposition he specifically asked Dr. Carney whether this stenosis could have been treated by dilatation and obviating the tracheostomy. And it was the doctor's opinion on October 5, 1992, that the delay missed the window of opportunity to utilize dilatation to treat the tracheal stenosis thereby requiring the patient to undergo a tracheostomy.

* * *

Q. Can we have the court reporter read back the last question that was objected to?

THE COURT: Yes.

(Record read as requested.)

Q. Did you hear the question, Doctor?

A. Yes.

Q. Can you answer the question?

A. The question was, why is timing critical between the diagnosis and treatment for his condition.

The answer is that once a tracheal stenosis begins to provoke symptoms, it can proceed fairly rapidly. And it—if you want to reverse it with the minimum amount of interference, you have to dilate it. And you need that time—the larger the opening the easier it is for dilatation and the less stress it is on the patient. And dilating is stretching it.

Q. Now, in this case, do you have an opinion within a reasonable degree of medical certainty as to whether the delay in treatment of this patient's condition of subglottic stenosis was a deviation in the standard of care for a reasonable well-qualified internist such as Dr. Kash?

MR. CUNNINGHAM: Objection.

Q. Under the circumstances in this case?

MR. CUNNINGHAM: Object to the lack of foundation as to subglottic stenosis for this witness.

THE COURT: Overruled.

THE WITNESS: Yes.

Q. What is the basis of that opinion, Doctor?

A. The basis of that opinion is that respiratory stridor is essentially an emergency condition, especially when it is first developed in a patient and you really have to establish—to bring relief to the patient, but to establish the anatomical basis for it."

Several experts testified on behalf of the defendants, including the defendants themselves. Dr. Kash could not recall if the emergency room physician on November 7, 1986, mentioned stridor in their conversation or only mentioned decedent's breathing difficulties. However, Dr. Patricia Merwick testified that Dr. Kash would have been informed by the physician of the diagnosis of acute respiratory stridor, and plaintiff demonstrated that the emergency room board contained a large box labeled "diagnosis," which contained the notation "acute respiratory stridor." Moreover, Dr. Merwick agreed with plaintiff that acute respiratory stridor was not a medical diagnosis but merely a symptom, and that no actual diagnosis was written on decedent's emergency room chart for November 7, 1986.

The jury retired to deliberate on October 21, 1994, and sent the judge the following question on October 25, 1994—"We would like a clarification as to if we are not in unanimous agreement on a count, does that nonagreement presume a finding for the opposite party?" All attorneys were present, and after receiving their commentary, the trial court instructed the jurors, "The instructions given to you when considered altogether are sufficient." A few minutes after this response was given to the jury, the jury sent back two more questions: (2) "The jurors can agree as to negligence of 1 defendant—Kash—but are split as to the negligence of the other defendant. What

does that mean as to counts?'' and (3) ''If the jurors cannot unanimously agree on a count for the plaintiff against the other defendant, does a split automatically count for that defendant?'' The court decided not to read questions (2) and (3) to the attorneys because the questions revealed the jury's preliminary verdicts on some of the counts. The following colloquy ensued:

"THE COURT: They have become more specific in reference to the first question. They're asking primarily in the court's opinion the same question they asked originally, but they are being more specific.

MR. QUANDT [Counsel for Dr. McMahan]: Judge, in the absence of seeing the questions, in any event, I think that I would object to any response other than 'the instructions given to you when considered altogether are sufficient' or 'just follow the instructions.'

MR. VEDRINE [Counsel for appellant]: I would have no objection to amending the earlier indication that are sufficient to answer the questions."

The court sent the jury this response: "The instructions given to you, considered altogether, are sufficient to answer your questions."

On October 26, 1994, the jury found for the defendants on all counts except for the negligence claim of count I, in which it held for the plaintiff against appellant and determined damages as $900,000. Appellant's post-trial motions included a petition to reduce the award by the amount of plaintiff's settlement agreement with MacNeal. Plaintiff asked the trial court to commence a new hearing to apportion the settlement proceeds between the initial injury of October 2, 1986, and the later injury of November 9, 1986, with only proceeds from the later injury deducted from plaintiff's judgment against appellant. However, the trial court refused to allow a new hearing on the settlement, and it granted the appellant a reduction in the judgment of $250,000 to a total of $650,000. Appellant filed his appeal on February 16, 1995, and plaintiff cross-appealed on February 24, 1995.

OPINION

I

■ Appellant first argues that he is entitled to judgment *n.o.v.* because plaintiff's only medical expert, Dr. Carney, did not establish a *prima facie* case of medical negligence because (1) he lacked the qualifications necessary to testify, (2) he was unprepared and unacquainted with the facts of the case, and (3) his testimony failed to establish that Dr. Kash proximately caused any harm to plaintiff. Judgment *n.o.v.* should be entered only in those cases in which all of

the evidence, when viewed in the aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. *Pasquale v. Speed Products Engineering*, 166 Ill. 2d 337, 351, 654 N.E.2d 1365 (1995). Further, judgment *n.o.v.* is improper where reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented. *Pasquale*, 166 Ill. 2d at 351.

■ It is the plaintiff's duty to establish the proper standard of care, a deviation from that standard, and an injury proximately caused by that deviation. *Hajian v. Holy Family Hospital*, 273 Ill. App. 3d 932, 936, 652 N.E.2d 1132 (1995). Unless the alleged negligence is so grossly apparent or within the common knowledge of the lay person, expert testimony is required to establish the standard of care and its breach. *Northern Trust Co. v. Upjohn Co.*, 213 Ill. App. 3d 390, 406, 572 N.E.2d 1030 (1991).

■ Appellant first claims that Dr. Carney was incompetent and unqualified to testify. There are two requirements necessary to demonstrate an expert physician's qualifications to testify: (1) the physician must be a licensed member of the school of medicine about which he proposes to testify, and (2) the expert witness must show that he is familiar with the methods, procedures, and treatments ordinarily observed by other physicians in either the defendant physician's community or a similar community. *Jones v. O'Young*, 154 Ill. 2d 39, 43, 607 N.E.2d 224 (1992). A trial court's determination as to an expert's qualifications and competency to testify is not to be reversed on appeal unless the decision was an abuse of discretion. *Jones*, 154 Ill. 2d at 44.

■ Examining the first requirement, Dr. Carney is licensed in the school of medicine of thoracic surgery. Appellant has not alleged that a subglottic stenosis is not within that school of medicine, and thus we must presume that the first requirement is satisfied.

Addressing the second requirement, Dr. Carney's testimony demonstrated that he was familiar with the diagnosis and treatment of stenosis as ordinarily observed by other physicians. To the extent that Dr. Carney was more familiar with tracheal stenosis than subglottic stenosis, this was a matter going to the weight of his testimony and thus merely a matter for consideration by the jury. See *Jones*, 154 Ill. 2d at 44. Although appellant claims that Dr. Carney needed to be familiar with appellant's specialty of internal medicine to render an opinion, this contention is meritless. Whether the expert is qualified to testify is not dependent on whether he is a member of the same specialty or subspecialty of the defendant as the defendant but, rather, whether the allegations concern matters within his

knowledge and observation. *Jones*, 154 Ill. 2d at 43. Dr. Carney specifically testified that the standard of care for diagnosis and treatment of stenosis is the same for internists and cuts across all branches of medicine.

■ Appellant next claims that Dr. Carney was unprepared and unacquainted with the facts of the case. However, appellant has not demonstrated any unreviewed materials that were pertinent to Dr. Carney's opinion. Appellant places particular emphasis on Dr. Carney's failure to review appellant's deposition testimony that he did not recall whether the emergency room doctor informed appellant of decedent's stridor, and thus appellant claims that Dr. Carney did not know whether decedent's stridor was ever brought to appellant's attention. However, this contention fails for several reasons. First, although appellant cites this court to several pages in the record, on none of them does Dr. Carney state that he did not know or believe that appellant was informed of decedent's condition of stridor. Second, even if appellant's knowledge of the stridor was merely hypothesized by Dr. Carney, appellant has not shown how this would leave Dr. Carney unprepared to render his opinion of appellant's negligence. Lastly, we find scant evidentiary value in appellant's "do not recall" denial of hearing the emergency room diagnosis, considering appellant's bias and appellant's own expert, who testified that communication of the diagnosis would be standard practice. ·

Lastly, appellant alleges that Dr. Carney's testimony was insufficient to establish that appellant's failure to diagnose decedent proximately caused any injury to plaintiff. In order to establish proximate cause, plaintiff's evidence must show to a reasonable degree of medical certainty that the negligent delay in diagnosis lessened the effectiveness of treatment. *Hajian*, 273 Ill. App. 3d at 940; *Topp v. Logan*, 197 Ill. App. 3d 285, 299-300, 554 N.E.2d 454 (1990). Appellant contends that Dr. Carney spoke only in generalities about the effects of delayed treatment of a stenosis, without addressing the effect on decedent himself. However, Dr. Carney testified that Dr. Kash's conduct delayed the definitive treatment of decedent. Dr. Carney then testified:

> "The question was, why is timing critical between the diagnosis and treatment for *his* condition. The answer is that once a tracheal stenosis begins to provoke symptoms, it can proceed fairly rapidly. And it—if you want to reverse it with the minimum amount of interference, you have to dilate it." (Emphasis added.)

Dr. Carney also testified that dilation under emergency conditions reduces the effectiveness of treatment, and Dr. Edmund Viznias testified that the emergency intubation performed on decedent on

November 9, 1986, was a dilation of the stenosis. We conclude that Dr. Carney's testimony was sufficient to establish that Dr. Kash's delay in diagnosis lessened the effectiveness of the treatment of decedent's stenosis.

■ Appellant contends that if Dr. Carney testified only that (1) Dr. Kash's negligence delayed decedent's treatment and (2) delayed treatment is much less effective, then that testimony would be insufficient to show that Dr. Kash's negligent delay lessened the effectiveness of treatment. However, even assuming *arguendo* that appellant's characterization of the testimony were correct, we believe that statements (1) and (2) logically require the conclusion that decedent's treatment was less effective because of the delay. Appellant also argues that his experts testified that dilatation was never possible because of decedent's heart condition, but it was within the jury's province to weigh the strength of this testimony. *Topp*, 197 Ill. App. 3d at 298. Lastly, appellant contends that Dr. Carney did not establish that dilatation would have been 100% effective on November 7, 1986, or that dilatation would have been impossible on November 9, 1986. Nevertheless, plaintiff was not required to show in absolute terms that a different outcome would have occurred, as such certainty is never possible. See *Hajian*, 273 Ill. App. 3d at 939 (plaintiff not required to prove that a better result would have been obtained absent the alleged malpractice); *Topp*, 197 Ill. App. 3d at 299-300 (plaintiff must present evidence that earlier diagnosis *could* have altered final result). Taking the evidence in its most favorable light, plaintiff adequately demonstrated that negligent delay lessened the effectiveness of decedent's treatment.

## II

■ Appellant's next argument is that the verdict was against the manifest weight of the evidence. A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *Leonardi v. Loyola University*, 168 Ill. 2d 83, 106, 658 N.E.2d 450 (1995). In this case, a reasonable conclusion from the evidence was that appellant was presented with the symptom of acute stridor on November 7, 1993, and that appellant's actions negligently gave only temporary relief of the symptom without seeking out its most common underlying cause, a stenosis blockage. Because decedent's condition was not diagnosed and treated, decedent deteriorated until he was near death on November 9, 1993, and the stenosis was no longer manageable with dilatation treatment. Although plaintiff's experts supported a different conclusion, the weight

to be given to medical expert testimony is for the trier of fact to determine, and where the evidence is conflicting it is within the jury's province to resolve the conflict. *Topp*, 197 Ill. App. 3d at 298. Thus, we conclude that the judgment was not against the manifest weight of the evidence.

## III

■ Lastly, appellant contends that the court committed prejudicial error by refusing to reveal the exact comments of two jury questions. Initially, we note that appellant's counsel had no objections to the trial court's procedure. In order to properly preserve an issue for appeal, a party must make a contemporaneous objection. *Kim v. Evanston Hospital*, 240 Ill. App. 3d 881, 892, 608 N.E.2d 371 (1992). Where a party, as here, acquiesces in proceeding in a given manner, he is not in a position to claim he was prejudiced thereby. *People v. Jackson*, 145 Ill. 2d 43, 94, 582 N.E.2d 125 (1991). This rule continues to apply to alleged errors involving jury conduct. See *People v. Norfleet*, 259 Ill. App. 3d 381, 392, 630 N.E.2d 1231 (1994); *Zukosky v. Grounds*, 85 Ill. App. 3d 355, 363, 406 N.E.2d 848 (1980). As *Zukosky* stated, "Since [appellant's] counsel expressed no dissatisfaction with the trial court's disposition of the matter when he should and could have done so, he is deemed to have acquiesced in it and in so doing to have waived the point for review." *Zukosky*, 85 Ill. App. 3d at 363.

Even were we to address this issue, the appellant has not demonstrated what harm may have resulted from the court's response to the jury's questions. We agree with appellant that the preferred method is to allow counsel access to all jury inquiries, even if they reveal the temporary disposition of the jurors towards a cause at issue. See *Hunter v. Smallwood*, 28 Ill. App. 3d 386, 328 N.E.2d 344 (1975). Nevertheless, error is not reversible unless it was substantially prejudicial, thereby affecting the outcome of the trial. *Kim*, 240 Ill. App. 3d at 891. The questions involved the unanimous nature of jury verdicts, and eventually the jurors reached properly unanimous verdicts. Moreover, the questions were directed at the counts involving Dr. McMahan and not appellant. In addition, we do not see what prejudice appellant could have suffered from the court's standard answer. Appellant's claim that the questions may have reflected juror confusion in distinguishing the counts at issue is speculation and conjecture, at best, and cannot establish the substantial prejudice required for reversible error.

## IV

■ Turning to plaintiff's cross-appeal, plaintiff contends that the trial court improperly reduced the $900,000 award by the $250,000

plaintiff received in a previous settlement. However, the Joint Tortfeasor Contribution Act (740 ILCS 100/0.01 *et seq.* (West 1994)) provides that a settlement reduces the amount of recovery against another defendant liable for the same injury by the actual consideration paid for the release. *Patton v. Carbondale Clinic,* 161 Ill. 2d 357, 372, 641 N.E.2d 427 (1994). Where a promise on one side is supported by several promises on the other, the single promise will provide consideration for all the promises. *Patton,* 161 Ill. 2d at 372. Thus, because the $250,000 was consideration for all injuries the plaintiff suffered, including the one of November 7, 1986, the trial court properly subtracted the entire total from the judgment amount. At oral argument, plaintiff contended that *Patton* was not the law at the time of the trial court's decision; however, *Patton* was decided on July 28, 1994, long before appellant's post-trial motion for a reduction in the judgment.

Despite *Patton,* plaintiff asks this court to remand for a new hearing to reapportion the $250,000 settlement into damages by injury. Plaintiff argues that she suffered a change in the law when *Patton* was handed down because previously it was a codefendant's burden to demand apportionment by injury in order to retain any reduction from a later judgment. However, plaintiff admits in her reply brief that the law was unsettled at the time of her settlement, and thus a supreme court ruling on this issue was not an unforeseeable change of circumstances. In addition, we believe that reapportioning the settlement would be extremely problematic. In *Patton,* where the plaintiff had died and a settlement for two injuries had not been apportioned between them, the court stated, "[I]t is now impossible to apportion the settlement with Zieba ***. ***[I]t is now impossible for any trier of fact to hear evidence regarding Susanne's pain and suffering from the time of the accident until the time she received negligent medical care ***." *Patton,* 161 Ill. 2d at 369-70. This statement is fully applicable to this matter, and thus the trial court properly denied plaintiff's request to reapportion the settlement.

### V

Plaintiff also contends that the jury's verdict in favor of Dr. McMahan was against the manifest weight of the evidence. As stated previously, a judgment is against the manifest weight of the evidence only when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *Leonardi,* 168 Ill. 2d at 106. Plaintiff argues that the testimony of Dr. McMahan's expert witness was "clearly" based on a false assumption because it was incompatible with the testimony of another expert. However, the weight to be given to

medical expert testimony is for the trier of fact to determine, and where the evidence is conflicting it is within the jury's province to resolve the conflict. *Topp*, 197 Ill. App. 3d at 298. Moreover, Dr. McMahan's own testimony was sufficient to establish that he was not negligent, and plaintiff has not attacked the credibility of any of his testimony. Thus, plaintiff has not demonstrated that the jury's verdict was so unreasonable as to be against the manifest weight of the evidence.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

McNULTY, P.J., and GORDON, J., concur.