PER CURIAM.
AFFIRMED. NO OPINION.
See Rule 53(a)(1) and (a)(2)(F), Ala. R. App. P.
Stuart, C.J., and Main, Bryan, and Sellers, JJ., concur.
Shaw, J., concurs specially.
Bolin, Parker, Murdock, and Wise, JJ., dissent.
I concur to affirm the trial court's judgment. I write specially to respectfully respond to Justice Bolin's dissenting opinion.
The facts of this case are thoroughly discussed in the dissent, and I see no need to repeat them all here. For purposes of this writing, I note that Virginia Coleman was suffering from gastrointestinal bleeding, that she spent a night in the intensive-care unit of Stringfellow Memorial Hospital operated by Anniston HMA, LLC, d/b/a Stringfellow Memorial Hospital ("the Hospital"), and that she died the next day following surgery. The plaintiff, Jerry Coleman, the administrator of Virginia's estate, contends that additional treatment should have been rendered to Virginia the night before she died and that the failure to render such treatment caused her death. Virginia did not receive such additional treatment, it is alleged, because the nurses monitoring Virginia, who were employed by the Hospital, breached the standard of care by failing to call or to alert a doctor to Virginia's condition during that night.
The Hospital produced substantial evidence indicating that the nurses' failure to call the doctor made no difference in this case. Specifically, Dr. Clifford Black was the physician on standby. The nurses had contacted him at 9:40 p.m. regarding Virginia's condition. He ordered tests and ordered that testing recur every two hours; if Virginia's blood levels fell below a certain value, she was to receive a transfusion. Coleman's experts asserted that, during the night, the nurses should have again telephoned the doctor regarding Virginia's condition. Dr. Harry Moulis, one of Coleman's experts, opined that additional treatments were available and could have been given to Virginia had the nurses telephoned the doctor. Dr. Black disagreed; he specifically testified that he was "fully aware" of the condition that was causing the bleeding and that the records of Virginia's condition on the night in question showed no change that required the nurses to call him. In fact, when he saw Virginia the next morning, he reviewed her chart and spoke with the nurses about her condition and how she had progressed over the night. He did not change his previous order; he did not, at that time, order the "additional treatments" Dr. Moulis said were available. He testified that, if the *167 nurses had called him that night, he would not have changed the order he had given previously that evening: "I can state under oath that even had the nursing staff contacted me during that period of time, my Order would not have changed. This is made clear by the fact that my Order did not change when I saw the patient at 8:30 a.m." the next morning. So, Dr. Black's testimony indicates that even if the nurses had telephoned him, he would not have ordered the additional treatment Coleman argues Virginia should have received. This is undisputed in the record. This argument formed the basis of the Hospital's second motion for a summary judgment, which the trial court granted.
This is not just a situation where we have two dueling experts-Dr. Black and Dr. Moulis-arguing over what should have been done if the nurses had called; I agree with the dissent that the resolution of that dispute should be determined by the jury. But we also have an undisputed assertion of what would have actually happened if the nurses had telephoned him: Dr. Black testified that he-the physician on standby who had been treating Virginia that night-would not have ordered the additional treatment Dr. Moulis says was required.
The dissent addresses Dr. Black's testimony that he would not have ordered additional treatment had the nurses called by suggesting that the testimony created another issue for the jury to resolve. Specifically, the dissent points out that Dr. Black's testimony might be considered self-serving or the product of bias. Under different facts, I might agree: Years after the incident, Dr. Black might now say that he would have done nothing different, but Dr. Moulis suggests that a physician in Dr. Black's shoes-lest he commit medical malpractice-would have done the opposite. Thus, Dr. Black's credibility could be called into question. However, two factors unique to this case-one substantive and one procedural-cause me to disagree with the dissent.
When Dr. Black saw Virginia the next morning, he ordered no additional treatment. If, at that point, Dr. Black ordered no additional treatment, then how can his assertion that he would not have ordered additional treatment earlier, when Virginia was in a lesser state of decline, lack credibility? His actions the next morning confirm that a telephone call by the nurses the previous night would have resulted in no change in treatment. If Virginia's demise was the result of not receiving additional treatment, that failure to receive additional treatment would not have been caused by the nurses.
Further, as a matter of procedure, we cannot reverse the summary judgment on this ground: This specific issue concerning Dr. Black's credibility is neither preserved for review nor argued on appeal. In the trial court, the Hospital twice moved for a summary judgment. The first motion was denied, and, in support of the second motion, the Hospital produced Dr. Black's affidavit testimony and argued that Coleman could not prove causation. That was the sole basis of the second motion. Coleman, in his response to the second motion, made no argument regarding Dr. Black's affidavit other than incorporating the previous filings and stating: "Plaintiff submits that the Affidavit of Dr. Black does not materially change the record or evidence before the Court." Coleman presented no specific argument to the trial court suggesting that Dr. Black's affidavit was not credible or that it created an issue for the jury to decide. Because this argument was not raised in the trial court, it cannot form the basis of a reversal. Ex parte Ford Motor Co., 47 So.3d 234, 241 (Ala. 2010) (" ' "This Court cannot consider arguments *168 raised for the first time on appeal; our review is restricted to the evidence and arguments considered by the trial court." ' " (quoting Marks v. Tenbrunsel, 910 So.2d 1255, 1263 (Ala. 2005), quoting in turn Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala. 1992) )); and Totten v. Lighting & Supply, Inc., 507 So.2d 502, 503 (Ala. 1987) ("[O]n appeal, this Court is limited to a review of the record alone, and an issue not reflected in the record as having been raised in the trial court cannot be raised for the first time on appeal.").
Further, Coleman does not raise this issue on appeal-there is no argument in Coleman's brief claiming that Dr. Black's affidavit lacked credibility. There is no discussion of the affidavit, and there is no suggestion that Dr. Moulis's testimony discounted Dr. Black's testimony and thus created a credibility issue.[1] When an appellant fails to properly argue an issue, or does not argue it at all, that issue is waived and will not be considered for purposes of appellate review. Tucker v. Cullman-Jefferson Counties Gas Dist., 864 So.2d 317, 319 (Ala. 2003). Additionally, " 'no matter will be considered on appeal unless presented and argued in brief.' " Id. (quoting Braxton v. Stewart, 539 So.2d 284, 286 (Ala. Civ. App. 1988) ). It is clear to me that, because the trial court initially denied the Hospital's summary-judgment motion but then granted it after the submission of Dr. Black's affidavit, Dr. Black's testimony was a key basis for its decision. In light of the above discussion, I concur to affirm that decision.
Jerry Coleman, as administrator of the estate of Virginia Coleman, deceased, appeals from a summary judgment entered in favor of Anniston HMA, LLC, d/b/a Stringfellow Memorial Hospital ("the Hospital"). For the following reasons, I respectfully dissent from this Court's no-opinion affirmance of the summary judgment in favor of the Hospital.
Facts and Procedural History
On March 26, 2009, at 11:50 a.m., Virginia Coleman presented to the emergency department of Stringfellow Memorial Hospital by ambulance. She was vomiting blood and complained of headaches and abdominal pain. She was 84 years old and had a past medical history that included a bleeding ulcer and three cardiac stents. Virginia was on numerous medications, including anticoagulants.
Dr. Michael Proctor evaluated Virginia in the emergency room and assessed Virginia as having an "Acute Upper Gastrointestinal Bleed." At 2:30 p.m., she was admitted to the intensive-care unit by Dr. Heather Sabo and diagnosed with an upper gastrointestinal bleed, migraine, respiratory failure, and hypotension. She was seen by Dr. Leigh Hemphill at approximately 6:50 p.m., who noted her to have a "massive GI bleed." Dr. Hemphill's notes provide that "[t]he patient will need transfusion, IV proton pump inhibitors. We can try some p.o. Carafate but at the rate of this bleed, I do not think this will do much good. We have consulted GI and Surgery. The patient has indicated by previous decision that I am told that she is a No Code. Additional diagnostic interventions to appropriate clinical condition."
Virginia was seen by Dr. Sabo again at or around 7:50 p.m. Dr. Clifford Black, the surgeon on standby, was contacted by the Hospital's staff about Virginia's condition *169 at around 9:40 p.m. Dr. Black ordered further blood transfusion.
From 9:40 p.m. on March 26 to the morning of March 27, Virginia's blood volume dropped. Virginia's medical records indicate that she had decreased urine output; that her skin was pale and cool; that she had tachycardia ; that her blood pressure dropped; and that she was confused. Virginia lost almost seven units of blood, and three units were replaced. Virginia also received saline and platelets.
On March 27 at 8:30 a.m., Dr. Black examined Virginia. He recommended "Dr. Shaikh scoping her urgently to determine the source of the bleeding." An endoscopy was performed on Virginia at 11:27 a.m. A bleeding lesion was found. It was cauterized and injected with a constricting agent, and a clip was applied. Later that day, Virginia developed respiratory failure, was intubated, and ultimately suffered a full cardiac arrest. She was pronounced dead at 8:07 p.m. on March 27, 2009.
On March 24, 2011, Jerry Coleman, as administrator of Virginia's estate, filed a wrongful-death action under the Alabama Medical Liability Act, § 6-5-480 et seq. and § 6-5-540 et seq., Ala. Code 1975, in the Calhoun Circuit Court. The action named the Hospital and Dr. Sabo as defendants. Coleman alleged that the defendants were negligent in failing to properly assess, monitor, treat, and manage Virginia's care and, further, that the nursing staff failed to alert a physician of the severity of Virginia's condition during the night of March 26-27, 2009, and that her deteriorating condition went unreported until Virginia was seen by a physician at 8:30 a.m. the following morning.
Dr. Sabo passed away on November 28, 2012. On September 30, 2013, the parties filed a joint stipulation of dismissal as to Dr. Sabo, and the trial court entered an order dismissing Dr. Sabo with prejudice on October 2, 2013.
On January 28, 2016, the Hospital filed a motion for a summary judgment. In support of its motion, it attached the deposition testimony of Coleman's standard-of-care expert, Lisa Henson, a registered nurse. Henson contended that the Hospital's nursing staff had breached the standard of care because they failed to contact Virginia's physicians during the night of March 26, 2009, and early morning hours of March 27. Henson testified:
"Q. Go ahead and tell me what opinions you are prepared to offer in this case.
"A. My opinions stem from the nursing portion of the nurses that took care of [Virginia] from the period of time when she got into the ICU. My opinion is that the nurses had orders from the physicians to care for her. But from the last physician that saw her at 19:50, which was Dr. Sabo, no physician had laid eyes on her until the next morning. As a nurse, having a patient bleed out the way she was bleeding, should have been on the phone trying to express that to a physician, a provider that she is bleeding more than what we are putting in. She is not, you know-I need some help, I need a physician in here; that was not done. The orders that they had, they did carry out, but they did not let the physician know the extent of what [Virginia] was bleeding, and that should have been carried through. Someone should have notified the physician and let him know, whichever physician was directing her care at that time, at least that she was bleeding so much, and they didn't do that.
"Q. Is there some indication in the record to you that the physicians were not aware of this massive GI bleed?
*170 "A. One physician wrote that it was a massive GI bleed. That was earlier in the day. What I'm talking about is once she got into critical care and after Dr. Sabo saw her at 19:50, no other physician came to see her until 8:30 the next morning. She had lost approximately one-half of her circulating volume of blood. She was only given back three units of blood. She lost almost seven units of blood, but she was only given back three.
"....
"Q. If I understand then, your criticism of nursing care is between the time of admission at CCU [sic]-or actually, I would suppose, from Dr. Sabo's visit at 19:50 until what time the following morning?
"A. Until the following morning, until the doctor had seen her, and I think it was Dr. Black that saw her at 8:30 that morning, I could not find in the chart at any time after 21:40-the last physician was notified at 21:40 and that was Dr. Black was the one that the nurse had called to get the order for blood transfusion. He had given her an order if it was less than 28, to transfuse one unit of blood and to use that order for every H & H that was drawn, which the nurse did follow his orders. But no nurse ever contacted a physician after that to say she continues to bleed, she is bleeding massively, I need some help, what we are giving her is not working. No one ever contacted a physician to let them know that what they were doing and what their orders were for this patient was not working.
"....
"Q. So the nurses followed orders, but the nurses just should have been advising the physicians of the patient's condition more closely during that period of time?
"A. Correct.
"Q. So that the physicians could, if they felt the need, make other efforts to stabilize the patient?
"A. Correct.
"....
"Q. So had there been any changes in her vitals during that period of time which in and of themselves would have required nursing to call a physician?
"A. When she was tachycardic in the 120s-before she had been in the 70s and 80s area, 90s sometimes. But once she went to tachycardic, you know, close to 130, somebody should have been calling them and saying, you know, her heart rate is 130, her blood pressure is low. I don't think those were relayed to anybody because most of those things were documented on the blood volume slips and physicians don't look at those. So they wouldn't know unless a nurse told them, you know, I have got this going and, you know, she is more tachycardia, her blood pressure is low. They would not know that unless a nurse picked up the phone and called them and told them that. We are their eyes and ears. And we are supposed to be advocates for patients. If that were my patient, I would be on the phone every hour letting them know, you know, I've had this much out this hour, I've had this much out this hour, you know, this is what's going on; I think you need to get in here and see her now. And if he didn't come or wouldn't come, I would have kept going up the chain of command until I got to the medical director.
"....
"Q. The nurses per orders could not have given any more blood than what they gave, could they?
"A. Correct. They could not."
*171 The Hospital also referred to the testimony of Coleman's medical-causation expert, Dr. Harry Moulis. Dr. Moulis testified that it was his opinion that there was a delay in treatment of Virginia and that that delay caused her death. He testified that there were other treatment modalities that could have been administered before the endoscopy. Specifically, Dr. Moulis testified:
"Q. Let's sort of take a step back now, and we know from the records that sometime around 11:30 on the morning of the 26th, the patient came in by ambulance with an upper GI bleed. Correct?
"A. Correct.
"Q. The upper GI bleed was diagnosed quickly?
"A. Correct.
"Q. Now, do you have any criticisms of how the upper GI bleed was addressed, first of all, by the physician in the emergency room?
"A. I don't know how long it took for the physician to see the patient, I can't tell that from the records. I could just tell when the dictation was written.
"Q. Right.
"A. So I don't know if there was a delay in seeing the patient or not-
"Q. Right.
"A. -I can't find that information. There are guidelines, recommendations on what to do for a massive upper GI bleed. And he started two IV's, and I couldn't gather if there were two IV's started, getting a lot of fluids underway, ordering transfusions. When we're looking at transfusions, that's a whole other area of specialty, hematology, but it pertains, of course, here. One of those notes suggested give more than one unit of packed red blood cells. But the pathologist said, no, patient does not meet criteria for second unit pack red blood cells because the number wasn't low enough, but-
"Q. The hematic number was not low enough. Correct?
"A. That's correct. But in reality in a situation like this, more blood should have been given and that order by the pathologist should have been overwritten."
When Dr. Moulis was asked specifically about the delay in the endoscopy procedure, he stated:
"Q. Alright. How did the delay of the scope procedure lead to her cardiac arrest later that day on the 27th?
"A. The delay in the procedure may not have caused the death but the delay in overall treatment. There are other treatment modalities that could have or should have been administered before the endoscopy."
Dr. Moulis went on to testify that there were other treatments available and appropriate, such as a medication known as Sandostatin. It was his testimony that these other avenues or modalities of treatment should have been administered if it was going to be awhile before the endoscopy was performed.
"Q. Okay. What other delayed treatment were not made which could have led ultimately to her cardiac arrest ?
"A. Trying to halt the bleed medically before an endoscopy was performed. There's medication we often use called Sandostatin.
"Q. Okay.
"A. Originally that medication was used to treat suspected variceal bleeding. The studies have shown it helps decrease bleeding from any upper GI source. So it's an intravenous medication.
*172 "Q. So you're saying that some physicians should have prescribed that treatment for the bleed?
"A. Yes, if there was going to be a delay in endoscopy, yes.
"Q. Okay. My understanding is, they were seeking to treat the bleed through the use of platelets.
"A. Okay.
"Q. Did you see anything else, any other ways that they were trying to do so?
"A. As far as halting the bleed before endoscopy that's the only thing I found. The protonics, the intravenous medication, will not stop a bleed. It may stabilize a clot if it starts forming to decrease a second bleed if it starts, but it won't stop the bleed.
"Q. Okay. What I guess I need to try to understand is: In your opinion what ultimately led to this 84-year-old lady's cardiac arrest some several hours after the upper GI-
"....
"Q. So can you testify to a reasonable degree of medical certainty that the delay in having the endoscopy caused or contributed to cause her ultimate death?
"A. I can say delay in treatment; I can't say specifically the endoscopy. The medical literature suggests that urgent endoscopy within five hours versus delayed more than 12 hours may not have an [overall] impact, but other forms of medical care.
"Q. Okay, so if you can't say it about the endoscopy let's talk specifically, what other forms of medical care you believed were delayed or not provided which could have lead to her death?
"A. Well, I mentioned the Sandostatin or Somatostatin.
"Q. Somatostatin, okay.
"A. Platelets have been administered sooner.
"Q. Platelets sooner?
"A. Sure. And I understand that they were in a different facility. They weren't even at the hospital and they had to be brought in is what I could gather somewhere. There was a delay in administration from ordering.
"Q. Did you get that from the deposition?
"A. It may have been in there. I know I just glanced through that and happen to see that.
"Q. Okay. Go ahead.
"A. Extra blood volume, even though the blood count had not dropped dramatically. Remember, she got the first unit of blood. I think the two units were ordered, but the pathologist wouldn't release a second unit because her blood count wasn't low enough.
"Q. Okay.
"A. But she was exsanguinating; so, in our situation, I would have administered at least two units right away and have a lot more available just in case.
"Q. Okay. What else?
"....
"Q. So now that we sort of cleared that up [regarding the timing of a second unit of red blood cells], do you still believe that there were problems with getting extra blood volume in a timely basis?
"A. I do because probably by the time she got to the hospital, she had lost several units. When patients bleed, they lose blood cells and plasma. If they are given enough IV fluids, the blood count will drop because of dilution. If they are given no blood, a patient can have one pint of blood left in the body and a blood count would be normal. So without knowing how much volume the patient *173 received, it's hard to determine. But, my point is, she lost-from what I could gather, she was passing red blood per rectum. That's a large volume GI bleed.
"....
"Q: Based upon your experience, in your education and training and your review of the records that you have identified that you reviewed in this case, do you have an opinion as to whether or not a delay in treatment for [Virginia] more likely than not contributed to her death?
"A: I would say probably, based on my experience in my patients.
"Q: Now my question is not assuming what that delay may have been caused by. But in your opinion a delay in treatment, appropriate treatment for her, probably contributed to her death.
"A: I would say probably yes."
In its summary-judgment motion, the Hospital argued:
"In this case, Henson cannot testify as to causation at all, and Dr. Moulis has established 3-4 physician related factors which he believes may have delayed treatment of the decedent and contributed to her demise. What he did not establish is that some specific lack of knowledge of the decedent's condition on the part of any physician in any way caused delay. There is no testimony or evidence to this regard. In fact, [Coleman's] nursing expert had to admit that Dr. Black made no changes to the decedent's orders or care upon seeing the patient on the morning of the 27th.
"Further, the criticisms of [Dr.] Moulis are directed to orders and treatments that he contends should have been ordered on the 26th and the early morning hours of the 27th (the critical time period according to Henson), according to [Dr.] Moulis, these treatment modalities should have long been in place. In short, there is a total disconnect between [Coleman's] theory of causation ... and his theory of liability. Without evidence that 'points to at least one theory of causation, indicating a logical sequence of cause and effect,' there is no 'judicial basis for such a determination.' [The Hospital] is thus entitled to the entry of summary judgment as to all claims."
In response, Coleman attached additional parts of Henson's and Dr. Moulis's testimony, along with additional medical records of Virginia's. Coleman asserted that Henson's opinion was that the nurses working the overnight shift were negligent in failing to alert the doctors or to keep the doctors informed as to Virginia's worsening condition and that Dr. Moulis's testimony was to the effect that, in light of Virginia's worsening condition, other treatment modalities should have been taken before the endoscopy was performed. Coleman argued that the doctors were not given the opportunity to address Virginia's condition. He argued that Dr. Moulis's testimony regarding the delay in treatment was substantial evidence showing that Virginia's condition was adversely affected by the alleged negligence.
On March 21, 2016, the trial court denied the Hospital's summary-judgment motion. On June 24, 2016, the Hospital filed a renewed motion for a summary judgment, attaching the affidavit of Dr. Black, who testified, in pertinent part, as follows:
"Concerning [Virginia's] admission of 3/26/2009, I was requested by Dr. Heather Sabo to provide a surgical consult on [Virginia]. On 3/26/2009, [Virginia] had developed a substantial bleed in her abdomen. The plan of care for [Virginia] by Dr. Sabo was to obtain a GI consult and have a scope procedure performed to hopefully determine the area *174 of the bleed and repair it. I was standing by in case surgery was needed. In the interim, [Virginia] was being managed by the use of platelets and packed red blood cells in order to maintain her hematocrit and hemoglobin levels and maintaining blood volume with the assistance of normal saline IV.
"At 9:40 p.m. on the night of 3/26/2009 I was contacted by the ICU nursing staff and was provided all information regarding the patient's condition. I entered an Order to repeat hematocrit and hemoglobin testing every two (2) hours and if the patient's hematocrit fell below 28, to administer 1 unit of packed red blood cells. My review of the records indicate that these orders were followed by the nursing staff.
"I saw the patient at 8:30 a.m. on the morning of 3/27/2009. I spoke with nursing concerning her condition and how she had progressed through the previous evening and reviewed her chart. I considered her to be stable at that point, though slightly tachycardic. The plan was to continue to monitor and maintain her hematocrit and hemoglobin levels and wait the pending GI consult. The GI consult was performed later that morning by Dr. Rosen. Dr. Rosen performed an endoscopic procedure and repaired two (2) areas of bleeding in the patient's abdomen. Hours after this procedure. The patient then had sudden loss of blood pressure and ultimately passed away.
"I disagree with Dr. Moulis's opinion that there was a delay in treatment that in any way caused or contributed to cause [Virginia's] death.
"I note that the primary assertion of Lisa Henson, R.N., is that the ICU nurses at Stringfellow Memorial Hospital fell below the standard of care because they did not contact a physician after my Order of 9:40 p.m. until I saw [Virginia] the next morning at 8:30 a.m. I disagree. Beginning with my Order at 9:40 p.m., I was fully aware of the nature and extent of [Virginia's] GI bleed. My review of the records show no change significant enough to have required the nursing staff in the ICU during the evening and early morning hours of 3/26/2009 and 3/27/2009 to contact me. I can state under oath that even had the nursing staff contacted me during that period of time, my Order would not have changed. This is made clear by the fact that my Order did not change when I saw the patient at 8:30 a.m. on the 27th. ..."
In response, Coleman argued that Dr. Black's affidavit did not materially change the record or the evidence before the court. Coleman again argued that there were genuine issues of material fact precluding a summary judgment. He referenced his response to the Hospital's original summary-judgment motion in which he had argued that the doctors were not given the opportunity to address Virginia's worsening condition because of the nurses' negligence.[2] On July 15, 2016, the trial court granted the Hospital's renewed motion for a summary judgment. Coleman appealed.
Discussion
At the outset, I note that in Sorrell v. King, 946 So.2d 854 (Ala. 2006), this Court observed:
*175 "A plaintiff in a medical-malpractice action must also present expert testimony establishing a causal connection between the defendant's act or omission constituting the alleged breach and the injury suffered by the plaintiff. Pruitt v. Zeiger, 590 So.2d 236, 238 (Ala. 1991). See also Bradley v. Miller, 878 So.2d 262, 266 (Ala. 2003) ; University of Alabama Health Servs. Found., P.C. v. Bush, 638 So.2d 794, 802 (Ala. 1994) ; and Bradford v. McGee, 534 So.2d 1076, 1079 (Ala. 1988). To prove causation in a medical-malpractice case, the plaintiff must demonstrate ' "that the alleged negligence probably caused, rather than only possibly caused, the plaintiff's injury." ' Bradley, 878 So.2d at 266 (quoting University of Alabama Health Servs., 638 So.2d at 802 ). See also DCH Healthcare Auth. v. Duckworth, 883 So.2d 1214, 1217 (Ala. 2003) (' "There must be more than the mere possibility that the negligence complained of caused the injury; rather, there must be evidence that the negligence complained of probably caused the injury." ' (quoting Parker v. Collins, 605 So.2d 824, 826 (Ala. 1992) )); and Pendarvis v. Pennington, 521 So.2d 969, 970 (Ala. 1988) (' "The rule in medical malpractice cases is that to find liability, there must be more than a mere possibility or one possibility among others that the negligence complained of caused the injury; there must be evidence that the negligence probably caused the injury." ' (quoting Williams v. Bhoopathi, 474 So.2d 690, 691 (Ala. 1985), and citing Baker v. Chastain, 389 So.2d 932 (Ala. 1980) )). In Cain v. Howorth, 877 So.2d 566 (Ala. 2003), this Court stated:
" ' " 'To present a jury question, the plaintiff [in a medical-malpractice action] must adduce some evidence indicating that the alleged negligence (the breach of the appropriate standard of care) probably caused the injury. A mere possibility is insufficient. The evidence produced by the plaintiff must have "selective application" to one theory of causation.' " '
" 877 So.2d at 576 (quoting Rivard v. University of Alabama Health Servs. Found., P.C., 835 So.2d 987, 988 (Ala. 2002) )."
946 So.2d at 862. See also Breland v. Rich, 69 So.3d 803, 821 (Ala. 2011) ("Our cases addressing a delay in diagnosis and/or treatment provide that with regard to the issue of causation, the question is whether the breach of the standard of care, i.e., the delay in diagnosis and/or treatment, proximately and probably caused actual injury to the plaintiff.").
Coleman argues that he presented substantial evidence supporting a reasonable inference that the negligent conduct of the Hospital's employees probably caused or contributed to Virginia's death. He argues that, through Henson's testimony, he presented evidence showing that the Hospital's employees breached the standard of care in failing to communicate "at all" with Virginia's treating physicians in light of her declining condition and that Dr. Moulis's testimony is evidence that Virginia's death was probably caused or contributed to by a delay in providing her with the appropriate treatment. Coleman further argues that Dr. Black's testimony that he would not have ordered different or additional treatment even if had been informed of Virginia's declining condition simply presents a question for a jury.
The Hospital argues that, although there was testimony from Henson that there had been a breach of the standard of care and testimony from Dr. Moulis that a delay in treatment probably caused Virginia's death, there was no nexus between the two. The Hospital asserts that there *176 was no nexus because there was no testimony alleging that the breach in any way related to the delay in treatment. The Hospital further asserts that Dr. Black's testimony that he would not have changed his course of treatment even if he had been told during the overnight hours that Virginia's condition was worsening conclusively establishes that the nurses' care and treatment of Virginia during the overnight hours in no way caused or contributed to her death.
I disagree with the Hospital's assertion that there was a "disconnect" between Henson's testimony and Dr. Moulis's testimony. It is well settled that no expert can testify outside his or her area of expertise. Dr. Moulis could testify as to proximate cause, but he could not testify as to the applicable nursing standard of care because he is not a nurse and does not possess knowledge of nursing standards. Cf. Morgan v. Publix Super Markets, Inc., 138 So.3d 982 (Ala. 2011) (holding that physicians designated as experts were not qualified to give expert testimony regarding the standard of care applicable to pharmacists and whether that standard of care had been breached). Henson could testify as to the whether the nurses breached the standard of care, but could not testify as to whether that breach was the proximate cause of Virginia's death.
In Phillips v. Alamed Co., 588 So.2d 463, 465 (Ala. 1991), the plaintiff sued Alamed, a home-health-care company, alleging that its employees had been negligent in failing to properly assess the patient's condition and in failing to report her complaint of shortness of breath to her physician and that their negligence was a proximate cause of her death. The plaintiff argued that the trial court erred by sustaining Alamed's objection to the testimony of a registered nurse on the issue of proximate cause. This Court stated:
"The question of whether Alamed's failure to report [the patient's] complaint of shortness of breath to her physician proximately caused her death is clearly a question involving complex medical issues. Therefore, we cannot say that the trial judge abused its discretion by requiring the testimony of a physician and, implicitly, holding that a registered nurse was not competent to testify as an expert on the issue of proximate cause. Bell [v. Hart, 516 So.2d 562 (Ala. 1987) ]; Byars [v. Mixon, 292 Ala. 661, 299 So.2d 262 (1974) ]."
588 So.2d at 465.
Subsequently, in Hutchins v. DCH Regional Medical Center, 770 So.2d 49 (Ala. 2000), this Court held that the trial court did not err in denying the hospital's motion for a judgment as a matter of law, where a registered nurse had opined that the operating-room nurse had breached the standard of care for nursing in failing to adequately prepare a patient for surgery by scrubbing him with Betadine antiseptic, and a physician had opined that it was probable that improperly preparing a patient, in the absence of other factors, could cause an infection and, ultimately, death.
Viewing the evidence in a light most favorable to Coleman, the nonmovant, and entertaining such reasonable inferences as a jury would have been free to draw, as we are required to do under our summary-judgment standard of review, I conclude that there is no disconnect between Henson's testimony and Dr. Moulis's testimony. Henson testified that the nurses at the hospital were negligent and violated the applicable standard of care in failing to alert the physicians caring for Virginia of her worsening condition. She testified that the nurses were negligent in not contacting the physicians so that they could be informed as to the efficacy of the treatments *177 being given to Virginia in that her condition was getting worse. Henson stated that the physicians were not contacted and that no information had been provided to them between 9:40 p.m. on March 26 and 8:30 a.m. on March 27. Dr. Moulis's testimony is that, in light of Virginia's worsening condition, other treatments should have been undertaken before the endoscopy and that the delay in treatment probably caused her death. The nexus between Henson's testimony and Dr. Moulis's testimony is the reasonable inference that the nurses' failure to provide the physicians with information as to Virginia's worsening condition prevented the physicians from providing other treatment for Virginia. Coleman has presented substantial evidence that the Hospital breached the applicable standard of care in its treatment of Virginia. That is, I believe there is no disconnect between Henson's expert testimony on the breach of the standard of care and Dr. Moulis's expert testimony on proximate cause.
I now turn to whether Dr. Black's affidavit presented a question of fact, as Coleman asserts, or whether his testimony conclusively established that the nurses' care of Virginia did not contribute to her death, given Dr. Black's statement that he would not have changed his orders even if he had been notified that Virginia's condition worsened overnight.
Coleman cites University of Alabama Health Services Foundation, P.C. v. Bush, 638 So.2d 794 (Ala. 1994). In Bush, this Court held that the patient presented sufficient evidence that a neurosurgeon had deviated from the applicable standard of care. The three-year-old patient, who had a shunt placed in her brain shortly after birth to control her hydrocephalus, was taken to the emergency room and was then transferred to another hospital for treatment of a possible malfunction of the shunt. Noting that the patient had been suffering from fever, vomiting, and diarrhea and that she presented with a rigid neck and low fever, the neurosurgeon initially diagnosed her condition as meningitis or shunt malfunction and ordered that she be given the antibiotic Mefoxin. A tap of the shunt revealed that the shunt was functioning properly and that there was no infection in the cerebrospinal fluid. The neurosurgeon believed that one of the patient's several birth defects may have advanced so as to create a compartment that spinal fluid could enter, but could not thereafter circulate, and decided it was necessary to do a spinal tap. The spinal tap revealed that the patient did have an infection in the cerebrospinal fluid that was not in circulation with the cerebrospinal fluid drawn from her brain by the shunt. Based on his knowledge that 96 percent of all shunt-related meningitis infections are caused by staphylococcus, the neurosurgeon ordered that the patient be admitted and treated with Mefoxin. Subsequent tests revealed that she was infected by hemophilus influenza (the most common cause of meningitis in young children), not staphylococcus bacteria. The patient's antibiotic was switched to a combination of ampicillin and chloramphenicol, antibiotics that are more specific for hemophilus influenzameningitis and the standard treatment for that illness.
At trial, the plaintiff's expert opined that the neurosurgeon's initial treatment of the child's meningitis with Mefoxin based on the assumption that the meningitis was caused by a shunt-related staphylococcus infection was inappropriate because the shunt tap had revealed that the shunt fluid was not infected and that the standard of care at that time for treating meningitis in a child of the patient's age was to administer a combination of ampicillin and chloramphenicol as soon as possible after the initial diagnosis. The neurosurgeon opined *178 that, from his experience, 96 percent to 99 percent of infections in the presence of a shunt are due to staphylococcus, that there were other places the shunt could have been touching that could be infected, including the outside of the shunt, that Mefoxin has a very broad spectrum of coverage and was very good for staphylococcus, and that ampicillin does not cover staphylococcus. However, the jury found the neurosurgeon's employer liable. On appeal, the employer argued that the plaintiff failed to prove by expert testimony that the alleged malpractice caused the patient's injury.
The Bush Court noted that a physician does not deviate from the standard of care where there are several appropriate methods of treatment available. The Court, however, found that the testimony of the plaintiff's expert established that the standard of care required one treatment regimen to be followed (the administration of ampicillin and chloramphenicol ), which the neurosurgeon did not do. Finding that the evidence supported the jury verdict against the neurosurgeon's employer, this Court affirmed. In short, the parties in Bush presented conflicting medical expert opinions and the credibility of those witnesses could be resolved only by the trier of fact.
In the present case, there is a disagreement between two medical experts-Dr. Moulis and Dr. Black-as to the care that should have been provided to Virginia. This is exactly the genuine issue of material fact that is reserved for a jury. Dr. Black's assertion that he would not have changed his course of treatment even if he had been told that Virginia's condition was worsening does not conclusively establish that the nurses' care and treatment of Virginia during the overnight hours in no way caused or contributed to her death.
Courts in Illinois have addressed this issue, holding that where expert testimony establishes both a duty to notify and the availability of treatment that would have been successful had notice been given, the treating physician's statement that he would not have done anything had he been notified creates a genuine question of fact for the jury.
In Snelson v. Kamm, 204 Ill. 2d 1, 45-46, 272 Ill.Dec. 610, 634-35, 787 N.E.2d 796, 820-21 (2003), the Illinois Supreme Court stated:
"Snelson's suggestion that it is impossible for a plaintiff to prove causation where the doctor testifies that 'he would not have acted differently regardless of what information could have been given him [by the nurses]' is a red herring for two reasons. First, Snelson mistakenly assumes that a doctor will not be willing to tell the truth about whether the conduct of hospital nurses affected his decisionmaking ability. Second, a plaintiff would always be free to present expert testimony as to what a reasonably qualified physician would do with the undisclosed information and whether the failure to disclose the information was a proximate cause of the plaintiff's injury in order to discredit a doctor's assertion that the nurse's omission did not affect his decisionmaking. See Seef v. Ingalls Memorial Hospital, 311 Ill. App. 3d 7, 26-27, 243 Ill.Dec. 806, 724 N.E.2d 115 (1999) (O'Mara Frossard, P.J., dissenting). In such a case, a factual dispute as to proximate cause would be created sufficient for the jury to resolve. We do not, of course, have such a factual dispute in the present case."
(Emphasis added.)
The dissenting opinion in *179 Seef v. Ingalls Memorial Hospital, 311 Ill. App. 3d 7, 26-27, 243 Ill.Dec. 806, 821, 724 N.E.2d 115, 130 (1999), adopted by the Illinois Supreme Court in Snelson, states as follows:
"Dr. Sutkus [the plaintiff's physician] speculated about what he would have done had the nurse acted in accordance with the standard of care, whereas Dr. Lilling offered not speculation, but an expert medical opinion as to how an obstetrician meeting the standards of care should have proceeded if properly notified. The weight to be given to Dr. Sutkus' and Dr. Lilling's conflicting testimony was a matter for the jury to determine. Suttle v. Lake Forest Hospital, No. 1-97-3567 [1999 WL 777681] ( [Ill. App. Ct.] September 30, 1999) [not reported in North Eastern Reporter]. A trial court is not required to accept a defendant's hypothetical testimony as uncontroverted fact, particularly when the opposing party offers contradictory testimony. See Wodziak v. Kash, 278 Ill. App. 3d 901, 215 Ill.Dec. 388, 663 N.E.2d 138 (1996) (finding 'scant evidentiary value' in a medical malpractice defendant's self-serving testimony, due to bias)."
(Emphasis added.)
Simcich v. Dephillips, 2011 WL 10468169 (No. 3-10-0456, Ill. App. Ct. June 21, 2011), is an unpublished and nonprecedential opinion, but its facts are very close to the facts in this case:
"We are presented with the exact factual dispute discussed by our supreme court in the latter part of the above quoted passage from Snelson; that is, a treating physician who testifies that the alleged breach of the standard of care by nurses had no effect on his decision making and a plaintiff who presented expert testimony as to what a reasonably qualified physician would do with the undisclosed information and an allegation that failure to disclose the information was a proximate cause of plaintiff's injuries. Unlike the evidence presented in Snelson, nurse Osinksi testified that failure to orally disclose certain information deviated from the applicable standard of care. Dr. DeLong testified that the nurses' deviation from the applicable standard of care proximately caused plaintiff's injuries. Dr. Malek disagreed and testified that he would have done nothing differently prior to December 28 as that is when the plaintiff first presented with bilateral foot drop and the incision site became swollen. Given Dr. DeLong's and nurse Osinksi's testimony, the jury in this matter was free to believe or reject Dr. Malek's assertion that no action became warranted until December 28. As such, the trial court did not err in allowing the jury verdict to stand and denying [the hospital's] motion for a judgment [notwithstanding the verdict]."
(Emphasis added.)
Affirming the summary judgment in effect treats Dr. Black's testimony as to the hypothetical question of what he would have done had he been notified as dispositive of the issue whether the failure to notify made a difference. Dr. Black did nothing after 8:30 a.m., so his answer to the hypothetical is consistent with his conduct after having full knowledge. But why would it not be a jury question as to whether Dr. Black's answer is self-serving and the product of bias? Self-serving statements of an interested party that refer to matters exclusively within that party's knowledge create an issue of credibility that should not be decided by the court but should be left for the trier of fact. Accordingly, I submit that the summary judgment was therefore inappropriate.
Murdock and Wise, JJ., concur.

Coleman's brief discusses the affidavit as follows: "In this case, [the nurses] failed and the doctors were traveling blind. It is the Plaintiff's position herein that Dr. Black's Affidavit testimony merely creates a question of fact." Coleman's brief, at 14. There is no further discussion of the issue after that statement.

Justice Shaw argues that Coleman failed to raise the issue of Dr. Black's credibility. I believe the issue is properly before this Court; a trial court is precluded from engaging in credibility determinations on a summary-judgment motion. Here, the dueling experts created a genuine issue of material fact as to Virginia's care that precluded the entry of a summary judgment.